**UNITED STATES of America, Plaintiff,**

v.

**Joseph N. GALLO, Julius Miron, et al., Defendants.**

**No. CR–86–452(S).**

United States District Court, E.D. New York.

Aug. 7, 1987.

See also 668 F.Supp. 736.

Andrew J. Maloney, U.S. Atty., E.D. N.Y., Edward A. McDonald, Attorney-in-Charge, U.S. Dept. of Justice, Organized Crime Strike Force, E.D.N.Y., Brooklyn, N.Y. by Douglas Grover, Laura Ward, Christopher Ulrich; Deborah Watson, Atty., Appellate Section, Crim. Div., U.S. Dept. of Justice, Washington, D.C., for the U.S.

Andrew Lawler, New York City, for defendant Julius Miron.

WEINSTEIN, Chief Judge:

Defendant Julius Miron has been found guilty by a jury of conspiracy to participate in the Gambino Crime Family through a pattern of racketeering activity, consisting of Taft–Hartley violations and obstruction of justice. He was also found guilty on separate non-RICO Taft–Hartley and obstruction of justice counts.

Miron had been indicted along with fifteen codefendants in an action entitled *United States v. Gallo, et al.*, 668 F.Supp. 736 (E.D.N.Y.1987). *See United States v. Gallo*, 653 F.Supp. 320 (E.D.N.Y.1986); *United States v. Gallo*, 654 F.Supp. 463 (E.D.N.Y.1987). He was tried along with two codefendants for part of the labor union aspects of the conspiracy in the first of several severed trials.

Before trial Miron moved to dismiss the indictment against him on the ground that the government had improperly used, and would use, some of his prior immunized grand jury testimony in violation of 18 U.S.C. § 6002. At a pretrial hearing, the motion was denied. When the evidence of the government was introduced at the trial, the basis for both the defendant's and the government's contentions became clearer. Accordingly, following Miron's conviction, the court reopened the hearing. Additional evidence and the entire record of the trial were considered. *See United States v. Hossbach*, 518 F.Supp. 759, 771–72 (E.D.Pa. 1980) (court can more readily determine if government met its burden of showing independent sources after presentation of all trial evidence).

The law is cognizant of the importance of the privilege against self-incrimination, and of the need scrupulously to fulfill governmental promises of immunity. Yet, for the reasons indicated below, granting the defendant's motion, and with it the motion for the acquittal which would then logically be required, would constitute a perversion of the immunity statute. Immunization does not provide a warrant to commit new crimes.

## I. FACTS

In 1979, Miron, a successful businessman in the building supply industry, was sub-

poenaed to testify before a federal grand jury in connection with a criminal investigation of former labor official John Cody. That investigation, and the resultant indictment of Cody, 82–CR–13 (E.D.N.Y.), was conducted by the Department of Justice Organized Crime Strike Force in the Eastern District of New York, under the supervision of Special Attorney Michael Guadagno. The government was advised that Miron would invoke his Fifth Amendment privilege against self-incrimination before the grand jury. It applied for an order of immunity. On March 12, 1980, Judge Henry Bramwell granted the order.

On June 18, 1980, Miron testified before the grand jury pursuant to the grant of statutory immunity. 18 U.S.C. § 6002. The government questioned Miron about his relationship with John Cody and Teamsters' Local 282, about Cody's relationship with Paul Castellano, a leader of the Gambino Crime Family, and about a 1978 meeting set up by Cody at which Castellano, Miron and Cody settled a dispute over the price of materials Miron had supplied for homes being built by Castellano's sons. Miron's Grand Jury Testimony, *United States v. John Doe* (U.S. v. Cody), June 18, 1980.

In 1986 Castellano was named as an unindicted coconspirator of Miron and two other labor union officials, Louis Giardina and George Daly. That is the case now before us.

In the 1982 criminal litigation Cody was convicted of labor racketeering. Miron did not testify at that trial. Special Attorney Guadagno provided Miron's grand jury testimony to the probation officer who prepared Cody's presentence report. That report specifically referred to Miron's immunized testimony and the links it established between Cody and Castellano. Cody Presentence Report, 82–CR–13(S), at 11–12. The report indicated that Miron's testimony regarding the Miron–Castellano–Cody dispute resolution "corroborated" information provided by FBI informants as to the Cody–Castellano relationship.

At about the time of Cody's sentencing, the government initiated a series of applications for orders authorizing the placement of electronic bugs in the home of Paul Castellano. In its November 12, 1982 application for such an order, the government submitted an affidavit by FBI agent Joseph O'Brien, alleging probable cause to believe that discussions were ongoing in the Castellano residence concerning violations of the RICO conspiracy law—in particular, regarding loansharking, extortion, and murder. O'Brien did not contend that there was probable cause to believe that any labor racketeering or Taft–Hartley violations discussions would take place. Miron was not named as a person whom the government expected to intercept. Judge Bramwell signed the first interception order on November 12, 1982. Because the FBI was unable to gain immediate entrance to the Castellano home, the government repeated its application on three occasions prior to April 1983. Judge McLaughlin authorized the interception on December 23, 1982 and again on January 28, 1983. Judge Bramwell once again signed an order on March 7, 1983. There appears no doubt that all these orders were supported by ample evidence.

The FBI was finally able to enter the Castellano residence to install the eavesdropping device on March 23, 1983. During the first week or so of intercepted conversations, the FBI overheard discussions concerning labor matters, including possible violations of the Taft–Hartley and Hobbs Acts. On April 8, 1983, Agent O'Brien applied to Judge Bramwell for a renewal of the order. In his accompanying affidavit, O'Brien included new information indicating probable cause to believe that labor racketeering was being discussed, and requested an expansion of the order to cover Taft–Hartley and Hobbs Act violations. The material information that O'Brien added to support expansion to labor activities is set out at length below. The particular aspects relating to Miron are italicized. As is indicated in the discussion that follows at Section II C, *infra,* an important issue is whether information about Miron's grand Jury testimony was significant in the decision of the authorizing judge to expand the order.

## "INFORMATION CONCERNING LABOR RACKETEERING

"12. I [Agent O'Brien] ... noted in my affidavit of November 12, 1982, that I have learned that the Gambino Family is engaged in labor racketeering and the corrupt control of labor unions. However, I did not contend in any of my previous affidavits that there was probable cause to believe that the subjects would have discussions at the subject premises concerning labor racketeering in general, and in particular Hobbs Act and Taft–Hartley violations. On the basis of what I have learned from what has already been intercepted at the subject premises and the other information submitted herewith and in my previous affidavits, I submit that there is probable cause to believe that the subjects are also discussing labor racketeering violations at the subject premises.

"13. In connection with my assignment to this case, I have had conversations with several FBI agents who have extensive experience in the area of labor racketeering and, in particular, racketeering in the construction industry. Based on these conversations, especially with Special Agent James Brennan (who was assigned for three years to the FBI's LILREX investigation which resulted in the convictions of over 15 people in connection with labor racketeering in the construction industry) and my own experience and investigations, and information supplied to other agents by confidential informants, I have learned that the criminal activities in which members of the Gambino Family engage in the area of labor racketeering take many forms. Among those illegal activities are violations of the Hobbs Act and Taft–Hartley Act. In such situations, members of the Gambino Family usually supply 'muscle' or support for corrupt union officials. These union officials in turn extort money (or other things of value) from construction company contractors or other employers in the construction industry for labor peace (a commitment not to strike or create other labor problems) and in the case of non-unionized firms, for the right to employ non-union labor, usually at lower wages or fewer benefits. The corrupt union officials, of course, are required to split their payoffs with Gambino Family figures. In some situations, members of the Family or their close associates are actually union officials themselves. In others, members of the Family control companies in the construction industry and make payoffs themselves to labor officials in violation of the Taft–Hartley Act. Finally, there also exist situations where corrupt union officials accept payoffs from employers who have not actually been extorted in violation of the Taft–Hartley Act and share those payoffs with Family members.

"14. One labor official closely associated with the Gambino Family, and in particular with Paul Castellano, is John Cody, the President of Local 282 of the International Brotherhood of Teamsters, the local representing employees for companies primarily responsible for delivering materials and supplies to construction sites in the New York Metropolitan area. Mr. Cody was convicted in the United States District Court (USDC) for the Eastern District of New York (EDNY) in October, 1982, on RICO charges arising out of his extortionate practices and receipt of Taft–Hartley payoffs in connection with his operation of the union. The FBI has received information from two reliable informants that Cody was closely associated with Carlo Gambino, Castellano's predecessor, as head of the Family, and is now closely associated with Castellano in the conduct of his criminal activities.

"15. In connection with Cody's sentencing, federal prosecutors submitted to Judge Jacob Mishler a sentencing memorandum in which they stated:

Since Cody assumed power with Local 282, he has been known by the Federal Bureau of Investigation and other law enforcement agencies as a close associate of several high-ranking organized crime figures. Informant information which has been corroborated by physical surveillance and Cody's own admissions to FBI agents established a close relationship between Cody and both Carlo Gambino and Ettore Zappi.

After Gambino's death, Cody became associated with Paul Castellano, who succeeded Gambino as head of that organized crime family.

"16. In addition, the probation report contained information to the effect that Cody was closely linked to Paul Castellano.

"17. Significantly, despite the emphasis which the government placed on Cody's ties to Castellano and Cody's opportunity to challenge the government's contention concerning his links to Castellano and the Gambino Family, Cody did not take issue with them.

"18. *I am also informed by Special Attorney Michael Guadagno of the Organized Crime Strike Force in the EDNY that during his investigation of the Cody case, he heard testimony from Julie Miron, the President of Miron Mason Supplies. Mr. Miron said that he had supplied materials for the construction for homes Castellano's sons were building on Staten Island. A dispute arose over the price Mr. Miron was charging for the materials. Mr. Miron was then contacted by John Cody on behalf of Castellano. Cody said that he thought Mr. Miron's prices for the Castellano materials were too high. Cody then arranged a meeting which Paul Castellano, Cody, and Miron attended to discuss this dispute.*

"19. I am also informed by Special Agent Patrick Marshall that on the afternoon of March 1, 1983, at Fay and Allen's Restaurant, 1240 Third Avenue, New York, New York, he observed Paul Castellano and Thomas Bilotti in the company of Anthony Salerno, one of the most powerful members of the Genovese Organized Crime Family, Vincent Di Napoli, an uppon echelon member of the Genovese Family, and another man. Marshall approached the five men and greeted them. The man Marshall did not recognize identified himself as Al Mosca.

"20. I am informed by Special Agent James Brennan that Vincent Di Napoli was convicted in the United States District Court for the Eastern District of New York on RICO charges arising out of the LIL-REX investigation. The investigation established that Di Napoli, through his position in the Genovese Family, his association with other powerful organized crime figures, and his corrupt relationship with labor union officials, in particular, Theodore Maritas of the Carpenters Union, was at the heart of a corrupt extortion scheme which dominated a large segment of the construction industry. Indeed, Agent Brennan characterizes Di Napoli a[s] one of the most powerful organized crime labor racketeers in the New York area. Maritas, who was Napoli's co-defendant in the RICO case disappeared shortly before he was scheduled to stand trial. His wallet was found on the shore of the Long Island Sound. Significantly, Di Napoli's May 1, 1983, meeting with Castellano and Bilotti took place on the day before he was to report to prison to begin his five year prison term on RICO charges.

"21. A reliable confidential informant referred to as 'J' in my March 7, 1983 affidavit has reported that Al Mosca is associated with the Glenwood Concrete Company of New Jersey.

\* \* \*

"ADDITIONAL INFORMATION FROM CONFIDENTIAL INFORMANTS

"26. Informant 'J', previously identified in my affidavit of March 7, 1983, has reported in the past week that Paul Castellano continues to meet at his home with several members of the hierarchy of the Gambino Family, including Thomas Bilotti, James Failla, Pasquale Conte, and other prominent Family members, including Robert DiBernardo, Frank DiCicco, Joe Corrao, and Salvatore Barbato. In particular, 'J' reported that the meetings often concern the Gambino Family's interests in the concrete and construction industries and labor union matters in those industries, particularly matters concerning Local 282 of the Teamsters. 'J' also reported that Robert DiBernardo is currently attempting to assert influence over Bobby Sasso, the Secretary–Treasurer of Local 282 and the expected successor to John Cody.

\* \* \*

"THE RESULTS OF PHYSICAL
SURVEILLANCES

"31. [Extensive affidavit information about physical surveillance of the Castallano home, including repeated observations of automobiles connected to labor unions and their officials, including those of Teamsters Local 282 and Mason Tenders Union Local 23. *See* paragraphs 31(f), 31(*l*), 31(m), 31(n).]

"31. (g) *On March 24, 1983, at 4:32 PM, a car registered to Mr. Julie Miron (referred to above in connection with John Cody) was observed at the Castellano home.* In addition, I received information from informant 'J' referred to in my initial affidavit that on the afternoon of March 24, 1983, that Al Mosca (previously referred to above in connection with Vincent DiNapoli) was also present at the Castellano home.

"31. (o) On April 2, 1983, James Failla's car was seen at the Castellano home at 10:31 AM. Salvatore Barbato's car was seen there at 11:58 AM. Frank De Cicco's car was seen there at 12:10 PM. James Failla's car was seen there at 12:27 PM. *At 3:09 PM, cars known to be used by* Failla, Barbato, De Cicco, and *Mr. Julie Miron were seen at the Castellano home.* Salvatore Barbato's car was seen there at 4:25 PM.

"RESULTS OF ELECTRONIC
SURVEILLANCE

"32. Electronic surveillance was commenced pursuant to this court's order of March 7, 1983, on March 23, 1983.... [The subjects] are having conversations about loansharking and labor racketeering violations.

"33. On March 24, 1983, at approximately 12:30 PM, Paul Castellano was overheard. Cars used by Thomas Bilotti and Salvatore Barbato were seen at that time parked outside Castellano's home. In addition, as reported above, an informant reported that Al Mosca was also present in the home. Bilotti is a principal and vice-president of Scara–Mix Concrete Company, based on Staten Island, and of which Castellano's son, Philip is president. Barbato

is a shop steward at Scara–Mix and a representative of Local 282 of the Teamsters. The conversation intercepted here includes statements made by Paul Castellano. It also apparently includes statements made by Mosca, Bilotti and Barbato. The topic of the conversation was Local 282. Bobby Sasso, the Secretary–Treasurer of the Local, was mentioned. Also a person was overheard saying that someone should get a 'message to Cody,' presumably John Cody, the president of Local 282. In addition, the conversation appears to concern Castellano's desire to maintain the Gambino Family's long standing control of Local 282, despite Cody's impending imprisonment. Sasso is in line to take over Cody's position should Cody be unsuccessful on his appeal which is currently pending in the Second Circuit Court of Appeals.

"34. *On March 24, 1983, at approximately 5:45 PM, a person arrived in a chauffeur driven limousine. Our investigation reveals that the limousine is used by Mr. Julie Miron, the owner of a large lumber and building supply business. An earlier interception revealed that a person had telephonically contacted Castellano earlier in the day using the name 'Mr. Hennesey,' an apparent code name for Mr. Miron. 'Mr. Hennesy' made an appointment to meet with Castellano at his home at 5:45 PM. The conversation which Miron and Castellano had was basically inaudible, but there was a reference to surveillances,* presumably the surveillances the FBI is conducting in connection with this case, and in the states of New Jersey and Pennsylvania.

"35. On March 25, 1983, at approximately 11:45 AM, a person believed to be Mario Mastromarino of Westfield, New Jersey, met with Castellano. Informant 'J' identified Mastromarino as Castellano's guest. In addition, a car parked at the house was registered to Mastromarino. They were overheard discussing labor problems in connection with the Housebreakers Union in New Jersey. Castellano and Mastromarino agreed that it was hard to tell what was going on, because they have to be very cautious with people. They were

overheard mentioning the FBI and the name 'Gotti,' a possible reference to Gambino captain John Gotti. In addition, Mastromarino mentioned that he is receiving 1 million in 100 dollar bills.

\*     \*     \*

"40(a) On March 30, 1983, a conversation involving Paul Castellano, James Failla, and a third man was intercepted between approximately 11:00 AM and 1:20 PM. It appears that the third man was Louis Giardina, a member of the Genovese Crime Family and also a business agent in Local 23 of the Mason Tenders Union. I submit that Giardina was the participant in the conversation because one of the participants was called Lou by either Castellano or Failla. In addition, a car registered to Local 23 of the Mason Tenders Union was parked at Castellano's home during the time of the conversation and that car is believed to have been driven by Giardina. In the conversation, it appears that Castellano, Failla, and Giardina are discussing a union related problem at a job site. Phrases such as 'had a good thing,' and 'in our territory' were used. They were also overheard discussing Local 37 and saying that when someone tried to take it over, that two people were killed in the process. Also someone was overheard saying that somebody wants 200 dollars a day per man at the job site and we only want 50 dollars a day.

"(b) Reference was also made to Danny Pagano, a former business agent for Local 59 of the Laborers Union in the Bronx, who was convicted in connection with the LIL-REX investigation and received a two year prison term in connection with labor racketeering activities.

"(c) Later in the conversation, these men were overheard discussing their belief that the foreman and the shop steward at a job site may have been making 'their own bets.' Either Giardina or Failla said that 'they really don't need his permission to book.'

"(d) Towards the end of the conversation, there was a definite mention of 'the Vario crew' in context of having some past relationship with Giardina and his local.

The Vario crew is a reference to Paul Vario and his criminal associates. Cooperating witness Henry Hill reports that he was a close associate of Vario's for over 20 years, that Paul Vario is a capo in the Luchese Organized Crime Family, and that Vario engages in criminal activities in the construction industry and in connection with various Carpenters Locals."

The affidavit also included references to other, more oblique conversations which may have concerned labor matters, e.g., paragraphs 39(b), 39(g), and further surveillances and conversations of persons with labor connections, e.g., paragraphs 31(k), 31(p), 31(q), 39(a), 41, 42.

Judge Bramwell approved the renewal order, with the expansion to cover labor matters. It is apparent that (1) any judge of this court would have taken the same action, and that (2) the absence of the Miron references would have made no difference in the result. In terms of the order actually obtained, the immunized testimony of Miron had no impact at all.

The fruits of the Castellano physical and electronic surveillance were used to procure the 1986 indictment in this case. They constituted a substantial portion of the proof at trial against Miron.

The bug revealed that Miron, Castellano, Daly and Giardina had shared substantial sums obtained from Robert Peter Matthews, President of Matthews Industrial Piping. Matthews had in late 1981 obtained from the Mobil Oil Company a multimillion dollar contract to install pipelines in a new oil tank farm in Staten Island. He made the payments in 1981 and 1982 to get Daly's union of welders and pipefitters to look the other way while he brought in out-of-state welders in place of Daly's union's members. When a junior union official balked and insisted that Matthews hire local union welders, Matthews threatened to reveal the payoffs to the authorities. The taped conversation in 1983 of Miron and his fellow criminals, dealing with this emergency, along with the testimony of Matthews and documentary evidence, produced devastatingly incriminatory evidence against Miron and his cohorts.

Miron himself did not testify at his own trial and his compelled 1980 grand jury testimony was not introduced. He challenges the indictment and his conviction, on the theory that his grand jury testimony was used by Agent O'Brien to demonstrate the probable cause precipitating the Castellano bug, the fruits of which led to Miron's subsequent indictment and conviction. He contends that the use of his compelled testimony to secure evidence later used against him is *per se* prohibited by the Fifth Amendment proscription against self-incrimination.

### The Circumstances of O'Brien's Affidavit

Agent O'Brien testified at the hearings on this matter. His testimony, and that of other government witnesses, was candid and fully credible. O'Brien decided to apply for the expansion to labor matters after hearing the labor conversations in the interceptions obtained on March 24, 1983. At some point in the next two weeks, most likely on April 4th, *see* Hearing Transcript of May 19, 1987, at 90 (hereinafter May 19th Tr.), O'Brien approached Strike Force Attorney-in-Charge Edward McDonald for assistance in preparation of the renewal and expansion affidavit. O'Brien told McDonald about the surveillances and intercepted conversations, and asked for further information that would corroborate probable cause for the labor expansion. Because the conversations had referred extensively to Cody, McDonald gave O'Brien the information from Cody's presentence report and sentencing memorandum, which became the basis for paragraphs 15–17 of O'Brien's affidavit. (March 4th Tr. at 23; May 28th Tr. at 8–11; May 19th Tr. at 80–81.) McDonald dictated to O'Brien the language from the presentence report related in paragraph 15 of the affidavit. (May 18th Tr. at 8.) O'Brien had earlier obtained the information about the Cody-Castellano connection, in particular the FBI informant information included in paragraph 13, from FBI Special Agent James Brennan. (May 18th Tr. at 6, 15.)

O'Brien also mentioned to McDonald that Miron had been seen entering the Castellano residence. From his knowledge of the prior Cody case, McDonald immediately associated Miron with Cody, and told O'Brien to speak with Attorney Guadagno about that possible connection. (March 4th Tr. at 14–15; May 18th Tr. at 24; May 19th Tr. at 89–90.) Guadagno subsequently told O'Brien about Miron's testimony concerning the 1978 Castellano–Cody–Miron conference. (March 4th Tr. at 19–20.) This information became the basis of paragraph 18. Neither McDonald nor Guadagno mentioned to O'Brien that Miron's testimony had been given pursuant to a grant of immunity. (March 4th Tr. at 10, 15, 19–20.) McDonald does not recall whether he had remembered that immunity had been granted. (May 19th Tr. at 81.) O'Brien did not learn that the information may have come from immunized testimony until after the present motion was filed. (March 4th Tr. at 22.) O'Brien did not tell Guadagno anything about the reasons for his inquiry, or about Title III applications or affidavits; he merely said that McDonald had referred him to Guadagno to elicit information concerning labor racketeering, Cody, and Miron. (March 4th Tr. at 16; May 19th Tr. at 57–58, 60.)

For the purposes of this motion, the affidavit paragraphs related to labor union activities can be split into three separate categories. The first consists of those paragraphs whose inclusion was in no way a product of Miron's testimony. These include, at the very least, paragraphs 12, 13, 15 except for the final sentence, 19, 20, 21, 26, 31(f), 31(*l*), 31(m), 31(n), 31(o) except perhaps for the reference to Miron, 32, 33, 35, 40(a), 40(b), 40(c), and 40(d).

The second category is of those paragraphs which contain information which *may* have been verified in part on the basis of Miron's testimony. This includes paragraphs 14, 16, 17, the last sentence in paragraph 15, and a portion of paragraph 33. It is almost certain that these paragraphs would have been included in the affidavit even if Miron had never testified before the grand jury. They contain information which was obtained from other sufficient sources. Miron's description of his meet-

ing with Cody and Castallano was at most merely corroborative of the extensive and overwhelming evidence that the government had obtained from informants and other sources which resulted in Cody's conviction.

The final category consists of paragraphs 18, 34, and parts of 31(g) and 31(o). These portions were derived, at least in part, from Miron's compelled testimony. Paragraph 18 describes the testimony itself. Paragraphs 31(g), 31(o), and 34 record Miron's visits with Castellano, visits which conceivably would not have been notable without knowledge of the Miron–Cody–Castellano relationship.

## II. LAW

### A. *Use Immunity*

The Fifth Amendment privilege against self-incrimination is a "specific provision of which it is peculiarly true that 'a page of history is worth a volume of logic.'" *Ullman v. United States*, 350 U.S. 422, 438, 76 S.Ct. 497, 506, 100 L.Ed. 511 (1956) (quoting *New York Trust Co. v. Eisner*, 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921)). The power of government to compel persons to testify in judicial proceedings has a long and venerable pedigree of its own. *See Kastigar v. United States*, 406 U.S. 441, 443–45 & nn. 2–6, 92 S.Ct. 1653, 1655–56 & nn. 2–6, 32 L.Ed.2d 212 (1972). Immunity statutes, with their well-established historical roots in Anglo-American jurisprudence, *see id.* at 445 & n. 13, 92 S.Ct. at 1656 & n. 13, are "not incompatible" with the values underlying the Fifth Amendment where "they seek a rational accommodation between the imperatives of the privilege and the legitimate demands of government to compel citizens to testify." *Id.* at 445–46, 92 S.Ct. at 1656–57. In assessing the constitutionality of a grant of immunity, the fundamental inquiry is whether that immunity is "coextensive with the scope of the privilege." *Kastigar*, 406 U.S. at 449, 92 S.Ct. at 1659; *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 54, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964); *see also Glickstein v. United States*, 222 U.S. 139, 141, 32 S.Ct. 71, 72, 56 L.Ed. 128 (1911) (immunity must be "in all respects commensurate with the protection guaranteed by the constitutional limitation").

In *Counselman v. Hitchcock*, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892), the Supreme Court uttered its initial major pronouncement on the constitutionality of an immunity statute. The Immunity Act of 1868 had provided that no evidence "obtained from a party or witness by means of a judicial proceeding ... shall be given in evidence, or in any manner used against him ... in any court of the United States...." 142 U.S. at 560, 12 S.Ct. at 197. The Court construed the statute as affording protection against the direct use of a witness' testimony in a criminal proceeding against him, and not against other such use to which that testimony might be put which could eventually lead to future criminal penalties. 142 U.S. at 564, 12 S.Ct. at 198–99. Noting that an immunity statute cannot "replace" the constitutional privilege "unless it is so broad as to have the same extent in scope and effect," 142 U.S. at 585, 12 S.Ct. at 206, the Court declared the statute unconstitutional, because it did not fully protect against what has become known as the "derivative use" of the immunized testimony.

At the end of its opinion, the Court stated in passing that "a statutory enactment, to be valid, must afford absolute immunity against future prosecution *for the offense to which the question relates*." 142 U.S. at 586, 12 S.Ct. at 206 (emphasis added for reasons which appear in Section II B, below). In response to this dictum, which was broader than the "derivative use" rationale upon which the Court had based its decision, a new "transactional immunity" bill was enacted as the Compulsory Testimony Act of 1893. That law provided that "no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing, concerning which he may testify, or produce evidence, documentary or otherwise...." Act of Feb. 11, 1893, 27 Stat. 444. This statute became the basis for numerous federal immunity statutes prior

to 1970, each granting complete immunity as to any "transaction" about which the witness testified.

In 1970, after "re-examining applicable constitutional principles and the adequacy of existing law," *Kastigar,* 406 U.S. at 452, 92 S.Ct. at 1660, Congress enacted the statute pursuant to which the defendant here was compelled to testify. It provided for "use" rather than "transactional" immunity, but went further than the provision struck down in *Counselman* by proscribing indirect and derivative use as well. 18 U.S.C. § 6002 reads in part as follows:

> Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—
>
> (1) a court or grand jury of the United States, ...
>
> (2) an agency of the United States, or
>
> (3) either House of Congress, a joint committee of the two Houses, or a committee or a subcommittee of either House,
>
> and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

Congress noted that "[t]his statutory immunity is intended to be as broad as, but no broader than, the privilege against self-incrimination." S.Rep. No. 617, 91st Cong., 1st Sess. 145 (1970); H.Rep. No. 1549, 91st Cong., 2d Sess. 42 (1970), U.S.Code Cong. & Admin.News 1970, pp. 4007, 4017.

The Supreme Court upheld the constitutionality of this statute in *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), ruling that "use plus derivative use" immunity was coextensive with the scope of the privilege. 406 U.S. at 458, 92 S.Ct. at 1664. It regarded the *Counselman* language concerning the necessity of "absolute immunity" as unnecessary to that decision, and thus nonbinding dicta. 406 U.S. at 454–55 & n. 39, 92 S.Ct. at 1662 & n. 13. Transactional immunity, the Court determined, "affords the witness considerably *broader* protection than does the Fifth Amendment privilege." 406 U.S. at 453, 92 S.Ct. at 1661 (emphasis added).

To ensure that the "use plus derivative use" immunity would be honored, the Court emphasized that "[t]his total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an 'investigatory lead,' and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures." 406 U.S. at 460, 92 S.Ct. at 1664–65. This comprehensive proscription was to be enforced by imposing a strict burden of proof on the prosecution "that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." 406 U.S. at 460, 92 S.Ct. at 1665. The government's affirmative duty of proof is triggered " 'once a defendant demonstrates that he has testified, under a ... grant of immunity, to matters related to the ... prosecution....' " *Id.* (quoting *Murphy v. Waterfront Comm'n,* 378 U.S. 52, 79 n. 18, 84 S.Ct. 1594, 1609 n. 18, 12 L.Ed.2d 678 (1964)).

The *Kastigar* Court emphasized that the immunity granted must leave the witness " 'in substantially the same position as if the witness had claimed his privilege in the absence of a ... grant of immunity.' " 406 U.S. at 457, 92 S.Ct. at 1663 (quoting *Murphy,* 378 U.S. at 79, 84 S.Ct. at 1610). This test, which in effect restates the rule that the grant of immunity must be coextensive with the privilege, is the standard by which analysis must proceed.

## B. *Subsequent Crime Immunity*

The government contends that we need not decide whether it has met its burden of proving wholly independent legitimate

sources, because Miron could not in the first place have asserted the privilege in order to protect himself against prosecution for crimes committed *subsequent* to the compelled testimony. The defendant opposes any application of a subsequent act doctrine limiting his immunity.

As already noted, Miron's testimony was compelled in June 1980. It related to events which took place in the 1970's. The particular conspiracy crimes and predicate acts for which he was convicted took place between December 1981 and June 1983. Miron's conversations with Castellano were intercepted on March 24, 1983 and June 3, 1983, when Miron's crimes were in their most virulent state. The June 3rd tape was introduced as evidence at the trial, four years later, in 1987.

The immunity statute itself does not make any distinctions based upon the time or nature of the crimes in question, except insofar as it specifically refers to perjury or contumacious conduct. To emphasize, it says, *"no testimony or other information* compelled under the order (or any information *directly or indirectly derived* from such testimony or other information) *may be used against the witness in any criminal case....*" This language was echoed by the court in *Kastigar,* which noted that the immunity law "provides a sweeping proscription of *any* use, direct or indirect, of the compelled testimony and any information derived therefrom." 406 U.S. at 460, 92 S.Ct. at 1664 (emphasis added). The Court stressed that the Fifth Amendment privilege itself "prohibits the prosecutorial authorities from using the compelled testimony in *any* respect, and ... therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness." 406 U.S. at 453, 92 S.Ct. at 1661 (emphasis added).

Despite its expansive scope, any reading of the statute to provide protection against prosecution for all future crimes would establish an extraordinary anomaly in the law of immunity. It is contrary to the *Counselman* language, already emphasized *supra,* that restricted the protection to "the offense to which the question re-lates." 142 U.S. at 586, 12 S.Ct. at 206. If the defendant were correct, the modern "use plus derivative use" immunity approved in *Kastigar* would in an important respect provide far greater protection than the traditional "transactional" immunity, even though the 1970 statute was intended to constrict the scope of immunity to the level actually required by the Fifth Amendment. Congress explicitly instructed that the use immunity statute was meant to provide immunity "as broad as, *but no broader than,* the privilege against self-incrimination." S.Rep. No. 617, 91st Cong., 1st Sess. 145 (1970), H.Rep. No. 1549, 91st Cong., 2d Sess. 42 (1970), U.S.Code Cong. & Admin.News 1970, pp. 4007, 4017 (emphasis added).

*Counselman* made it clear that the object of the Fifth Amendment was to ensure that a witness not be compelled to give testimony "which might tend to show that he himself *had* committed a crime." 142 U.S. at 562, 12 S.Ct. at 198 (emphasis added). In order to provide protection "to the same extent" as the privilege, an immunity statute, therefore, "must afford absolute immunity against future prosecution *for the offense to which the question relates.*" 142 U.S. at 586, 12 S.Ct. at 206 (emphasis added). The transactional immunity statute reflected this basic rule, in that it protected against the use of "any transaction, matter or thing concerning which [the witness] may testify." In each case the reference necessarily is to a past act, since it is only about such an event that testimony can be elicited.

The Supreme Court has repeatedly emphasized the importance of chronology in construing an immunity grant. It has pointed out that under the pre–1970 immunity statute, immunity was intended to apply "only to *past* criminal acts concerning which the witness should be called to testify." *United States v. Bryan,* 339 U.S. 323, 340, 70 S.Ct. 724, 735, 94 L.Ed. 884 (1950) (emphasis in original). It long ago ruled that the constitutional privilege "relates to the past, and does not endow the person who testifies with a license to commit perjury." *Glickstein v. United States,* 222 U.S. 139, 142, 32 S.Ct. 71, 73, 56 L.Ed.

128 (1911). This doctrinal limitation to past crimes remained applicable after the 1970 enactment of 18 U.S.C. § 6002. *See United States v. Wong*, 431 U.S. 174, 97 S.Ct. 1823, 52 L.Ed.2d 231 (1977); *see also United States v. Housand*, 550 F.2d 818, 822 (2d Cir.1977) (immunity relates to past crimes; perjury is a new crime with respect to which no immunity was conferred), *cert. denied*, 431 U.S. 970, 97 S.Ct. 2931, 53 L.Ed.2d 1066 (1977).

As the Second Circuit has pointed out, the perjury doctrine is not merely the result of the exception included at the end of the immunity statute. That exception is technically superfluous because the perjured testimony, since it is not a past act concerning which the witness is questioned, is not subject to the Fifth Amendment privilege. "[T]he testimony falls outside the constitutional privilege." *United States v. Tramunti*, 500 F.2d 1334, 1342 (2d Cir. 1974), *cert. denied*, 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974). By lying, the court continued, "the witness commits a *new* crime beyond the scope of the immunity, which was intended to protect him against his past indiscretions." *Id.* (emphasis added). The Court of Appeals concluded that the immunity "does not extend *in futuro.*" *Id.* at 1344.

*Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), and subsequent developments are not to the contrary. The defendant in *Marchetti* accrued income through gambling, and was convicted for failing to register to pay a federal occupational tax on wagering. The Court found that Marchetti's registration of his betting would inevitably incriminate him as to his illegal gambling. The statute required the acquisition of a federal gambling tax stamp, which would in effect declare "a present intent to commence gambling activities." 390 U.S. at 53, 88 S.Ct. at 705. The Court also determined that even without any threat of incrimination for past acts, the statute was nonetheless unconstitutional because of the incrimination as to future acts. It rejected the premise that the privilege is entirely inapplicable to prospective acts, concluding that "[w]e see no

warrant for so rigorous a constraint upon the constitutional privilege." *Id.*

*Marchetti* eschewed the "rigid chronological distinction between past and prospective acts," preferring instead to rely on the "central standard for the privilege's application," namely, "whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination." *Id.* (citing *Rogers v. United States*, 340 U.S. 367, 374, 71 S.Ct. 438, 442, 95 L.Ed. 344 (1951); *Brown v. Walker*, 161 U.S. 591, 600, 16 S.Ct. 644, 648, 40 L.Ed. 819 (1896)). Thus, *Marchetti* concluded, the operative standard is the "substantiality of incrimination," rather than "mere time [of offense]." 390 U.S. at 54, 88 S.Ct. at 705–06.

A "substantial and real"—"trifling and imaginary" distinction is not particularly useful in a case such as the instant one. The Court left undetermined the precise boundary between what were to be considered "substantial" hazards, and what were to be deemed merely "speculative," suggesting only that "prospective acts will doubtless ordinarily involve only speculative and insubstantial risks of incrimination." 390 U.S. at 54, 88 S.Ct. at 705.

Post-*Marchetti* cases have drastically constricted the category of prospective offenses which might be considered "substantial" hazards. In *United States v. Freed*, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), the defendants were indicted for possessing unregistered hand grenades in violation of the National Firearms Act. The Act explicitly barred use of the registration information in prosecution for prior or concurrent offenses. 401 U.S. at 604, 91 S.Ct. at 1115 (citing 26 U.S.C. § 5848 (1964 ed., Supp. V)). The defendants argued that fingerprints and photographs on the registration would incriminate the transferees "in the future." The Court ruled that those were merely "trifling or imaginary," rather than "substantial and real," "hazards of incrimination." 41 U.S. at 606, 91 S.Ct. at 1116. It explicitly rejected the argument that there exists a "periphery" of the Self-Incrimination Clause "which protects a person against

incrimination not only against past or present transgressions but which supplies insulation for a career of crime about to be launched." The Court refused to allow "such an expansive interpretation" of the Fifth Amendment. 401 U.S. at 606–07, 91 S.Ct. at 1117. *See also id.* at 611, 91 S.Ct. at 1119 (Brennan, J., concurring) (same).

Similarly, the Second Circuit ruled that a declaration under the National Firearms Act of an intention to produce a firearm, "does not simultaneously admit a violation of another section of the ... Act," in that case a prospective unregistered transfer of the firearms. *DeSimone v. United States,* 423 F.2d 576, 581 (2d Cir.) *cert. denied,* 400 U.S. 842, 91 S.Ct. 84, 27 L.Ed.2d 77 (1970). Even if such an illegal transfer were likely, the court decided, the mere possibility that the defendant or one of his customers "may decide to commit a different criminal act in the future is not enough to support the fifth amendment claim." *Id.* at 581–82. The incrimination there was merely speculative, even if it was statistically or sociologically probable. *Marchetti* was distinguished by the fact that in that case "49 states prohibited the very activity disclosed by payment of the tax," thus constituting a "real hazard of incrimination." *Id.* at 581 (quoting *Varitimos v. United States,* 404 F.2d 1030, 1034 (1st Cir.1968), *cert. denied,* 395 U.S. 976, 89 S.Ct. 2126, 23 L.Ed.2d 765 (1969)).

Finally, in *United States v. Apfelbaum,* 445 U.S. 115, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980), the Supreme Court re-established a virtual *per se* exclusion from the scope of the privilege for prospective acts. The issue in *Apfelbaum* was whether *truthful* testimony compelled under a grant of immunity could be introduced as evidence in a subsequent prosecution for false statement committed during that same testimony. In ruling that such testimony was admissible, the Court acknowledged that the perjury "exception" to the privilege is based not on the falsity of the statement, but rather, on the inapplicability of the privilege to acts committed subsequent to the grant of immunity. "A future intention to commit perjury ... is not by itself sufficient to create a 'substantial and real' hazard that

permits invocation of the Fifth Amendment," even as to those portions of the testimony that were not perjurious. 445 U.S. at 131, 100 S.Ct. at 957. The Court explicitly approved *Freed*'s narrowing of *Marchetti,* 445 U.S. at 129–30, 100 S.Ct. at 959, and further distinguished *Marchetti* on the ground that the gambling activities there were "ongoing," rather than merely prospective. 445 U.S. at 129, 100 S.Ct. at 956. *See also United States v. Quatermain,* 613 F.2d 38, 42 (3d Cir.) (*Marchetti* limited by *Freed;* in *Marchetti,* "future conduct" was part of a "continuing course of similar criminal activity"), *cert. denied,* 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980). The logical inference extracted from the confluence of *Freed, DeSimone* and *Apfelbaum* is that *Marchetti* is limited to those cases where the prospective acts are merely an extension of identical "ongoing" past and present acts. The *Apfelbaum* court concluded that "the Fifth Amendment does not prevent the use of respondent's false swearing because, at the time he was granted immunity, the privilege would not have protected him against false testimony that he later might decide to give." 445 U.S. at 130, 100 S.Ct. at 957.

As the preceeding quotation from *Apfelbaum* makes clear, the focus of the inquiry in determining whether the grant of immunity is "coextensive" with the privilege is the scope of the protection that the privilege confers. *See also United States v. Quatermain,* 613 F.2d 38, 41 (3d Cir.), *cert. denied,* 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980). The proper question, then, is not what would have occurred had the witness remained silent pursuant to the privilege, but rather, what the witness may properly have withheld pursuant to the privilege in the first place. To be coextensive with the privilege, the immunity need not "treat the witness as if he had remained silent." It is "analytically incorrect to equate the benefits of remaining silent as a result of invocation of the Fifth Amendment privilege with the protections conferred by the privilege." *Apfelbaum,* 445 U.S. at 127, 100 S.Ct. at 955. Thus, the two-part test is that the compelled testimo-

ny remains inadmissible in all prosecutions "for offenses [1] committed prior to the grant of immunity that [2] *would have permitted the witness to invoke his Fifth Amendment privilege absent the grant.*" 445 U.S. at 128, 100 S.Ct. at 956 (emphasis added). This test reiterates the observation of Justice Frankfurter that "the immunity granted need only remove those sanctions which generate the fear justifying invocation of the privilege." *Ullmann v. United States*, 350 U.S. 422, 431, 76 S.Ct. 497, 502, 100 L.Ed. 511 (1956). Section 6002 itself only confers immunity "whenever a witness refuses on the basis of his privilege against self-incrimination, to testify...." If the basis for assertion of the privilege extends only to past acts, the grant of immunity extends no further.

What is clear from more than one-hundred years of experience with immunity provisions is that the language in Kastigar relied on by the defendant, prohibiting the use of compelled testimony "in *any* respect," is not to be taken literally. In *Apfelbaum* the Supreme Court acknowledged that this language was somewhat hyperbolic and inconsistent with the history and logic behind the privilege. 445 U.S. at 120 n. 6, 100 S.Ct. at 952 n. 6. *See also United States v. Bryan*, 339 U.S. 323, 342, 70 S.Ct. 724, 736, 94 L.Ed. 884 (1950) ("The words 'any criminal proceeding' cannot sensibly or reasonably be construed so literally and generally ...") (quoting *Edelstein v. United States*, 149 F. 636, 644 (8th Cir. 1906), *cert. denied*, 205 U.S. 543, 27 S.Ct. 791, 51 L.Ed. 922 (1907)).

The privilege against self-incrimination is inapplicable to noncontinuing new prospective crimes. *Cf. United States v. Hossbach*, 518 F.Supp. 759 (E.D.Pa.1980) (where there exist overlapping conspiracies with identical overt acts, immunity may extend to the related future acts). The privilege does not supply "insulation for a career of crime about to be launched." *United States v. Freed*, 401 U.S. 601, 606–07, 91 S.Ct. 1112, 1117, 28 L.Ed.2d 356 (1971). A defendant cannot refuse to testify on the ground that what he now says may incriminate him in a possible crime he may decide to commit in the future. If in fact the

grand jury is investigating prior crimes and not the continuing criminality of the person granted immunity, the compelled grand jury testimony should later be directly admissible in proving future criminality. A fortiori, indirect use would also be authorized in such circumstances.

### C. *Immateriality of Government Use*

As to those offenses for which the privilege against self-incrimination may properly be invoked, the immunity conferred must leave the witness "in substantially the same [but no better] position as if the witness had claimed his privilege in the absence of a ... grant of immunity." *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 79, 84 S.Ct. 1594, 1610, 12 L.Ed.2d 678 (1964). *See also Kastigar*, 406 U.S. at 462, 92 S.Ct. at 1666; *United States v. Kurzer*, 534 F.2d 511, 516 (2d Cir.1976). *Cf. Harrison v. United States*, 392 U.S. 219, 224–25, 88 S.Ct. 2008, 2011, 20 L.Ed.2d 1047 (1968) (coerced confessions); *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963) (illegal searches). The burden is on the government to prove "that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Kastigar*, 406 U.S. at 460, 92 S.Ct. at 1665. *See also Murphy*, 378 U.S. at 79 n. 18, 84 S.Ct. at 1609 n. 18. This "heavy burden," 406 U.S. at 461, 92 S.Ct. at 1665, is not satisfied by the prosecution's mere assertion that the immunized testimony was not used. *United States v. Tantalo*, 680 F.2d 903, 908 (2d Cir.1982).

The defendant is entitled to a fair hearing at which the government must make an affirmative showing of its wholly independent legitimate sources. *Id.* We assume, because of the importance of the constitutional right involved, that the burden is either one of "clear and convincing evidence" or "beyond a reasonable doubt." *See United States v. Hossbach*, 518 F.Supp. 759, 772 (E.D.Pa.1980) (clear and convincing evidence). *Cf. Allen v. Illinois*, —— U.S. ——, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986) (proceedings to have person declared dangerous were not "criminal" for

self-incrimination purposes, but did require proof beyond a reasonable doubt); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (for summary judgment motion in libel case, court should be guided by clear and convincing standard in determining whether genuine issue of actual malice exists). *Cf. also United States v. Fatico*, 458 F.Supp. 388 (E.D.N.Y.1978), *aff'd*, 603 F.2d 1053 (2d Cir.1979), *cert. denied*, 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980); *but cf. Lego v. Twomey*, 404 U.S. 477, 487 n. 15, 92 S.Ct. 619, 625–26 n. 15, 30 L.Ed.2d 618 (1972) (distinguishing on other grounds *United States v. Schipani*, 289 F.Supp. 43 (E.D.N.Y.1968), *aff'd*, 414 F.2d 1262 (2d. Cir.1969), *cert. denied*, 397 U.S. 922, 90 S.Ct., 902, 25 L.Ed.2d 102 (1970)).

Even where immunized testimony was in some literal sense "used," that use is of no constitutional significance if it had no effect at all on events, because it leaves the witness in the same position as if the testimony had never been heard. It is but a leaf dropping unobserved in a deep forest.

*United States v. Kurzer*, 534 F.2d 511 (2d Cir.1976), relied upon by the defendant, is not persuasive authority to the contrary. Kurzer was the accountant of a meat industry magnate, Moe Steinman. In 1973, Kurzer's compelled testimony concerned Steinman's filing of false tax returns. Steinman was indicted on charges of filing false returns and bribery. The government informed Steinman that other company officers, not including Kurzer, had revealed information regarding further false invoice schemes. With the threat of additional serious indictments imminent, Steinman decided to cooperate. He told the government about wholly separate false tax filings in which Kurzer was involved. Kurzer subsequently was indicted for those false filings, which were entirely independent from those about which he had testified. *Id.* at 514. Neither the trial court nor the court of appeals mentioned whether the crimes alleged occurred subsequent or prior to Kurzer's compelled testimony. The courts do not seem to have addressed the issue of whether Kurzer's privilege extended to the crimes for which he was charged. It must be assumed that the court considered them "sufficiently interrelated" and continuing to have made incrimination substantial rather than merely speculative.

The court in Kurzer identified the pivotal question as whether Kurzer's testimony "contributed to Steinman's decision to testify." *Id.* at 517. The government would satisfy its "wholly independent source" burden if it could prove that "Steinman would have testified against Kurzer because of the case the Government had developed against him entirely apart from Kurzer's information, even if the prior indictment to which Kurzer's information had contributed never existed." *Id.* Thus, even though Kurzer's immunized testimony was "used" in some trivial or literal sense, such use was not in and of itself dispositive. The proper inquiry under *Kurzer* is therefore whether the "use" had any tangible *effect* on what subsequently occurred.

### III. APPLICATION OF LAW TO FACTS

It is apparent that Miron could not have refused to testify before the 1980 Grand Jury on the ground that more than a year later he might want to enter a conspiracy to take advantage of a criminal opportunity wholly unforseeable at the time of the testimony. The proof showed that the criminal activity for which he was convicted began after he testified before the grand jury. His testimony was not immunized as to that subsequent crime.

Although the indictment dates 1967 as the beginning of the Gambino Family RICO conspiracy, it charges that Miron *joined* the RICO conspiracy only in or after January 1981. His criminal conduct was directed at a target of opportunity—the construction of the Port Mobil oil tank farm in Staten Island—that emerged in 1981 through 1983. The pipe-welding contractor conspired with Daly, Miron, Giardina and Castellano in a classic payoff-sweetheart deal. The welding contract was not awarded until the late fall of 1981, more than a year after Miron's grand jury testimony. It would have been impossible at the time

of his testimony for Miron even to have contemplated the particular crimes for which he was convicted. The immunity agreement could not prevent the government from using the testimony to explore leads to the new crime as it unfolded.

Even if the interpretation of immunity law to exclude future independent crimes grants insufficient protection to those who are granted immunity, so that the testimony in question here was immunized as to the 1983 crimes, no violation of any right of Miron has been shown. It is apparent that even without that testimony, the government would have acted exactly as it did, and no judge of this court would have deviated in the slightest from the course of granting orders authorizing the bugs that revealed information incriminatory to Miron.

Miron's 1980 grand jury testimony did not affect O'Brien's decision to apply for the labor expansion at the time of the renewal of the Castellano bugging order. The inclusion of information from that testimony in the affidavit did not "contribute" to Judge Bramwell's decision to approve the labor expansion. The wholly independent legitimate sources for both of those pivotal decisions have been proven by the government beyond a reasonable doubt. Miron has been left in precisely the same position as if he had never testified in the *Cody* case.

Given the large number of independent investigating and prosecutorial agencies in the New York metropolitan area, it is next to impossible to completely guard against some indirect leakage of information. No one like Miron, who is granted limited use immunity in a good faith attempt to develop leads as to past criminal acts of third parties, should receive an "immunity bath" as well as an "invisible shield" against prosecution for future crimes, particularly where the defendant's compelled testimony is of absolutely no significance in that prosecution.

## IV. CONCLUSION

Defendant Miron's motion to suppress information received from bugs on Castel-

lano's home is denied. The motion to set aside the judgment of conviction is denied.

So ordered.