**UNITED STATES of America,**

v.

**Ezra SASSON and Zakay Sasson, Defendants.**

**No. 03–CR–489(ERK).**

United States District Court, E.D. New York.

Sept. 13, 2004.

Jed E. Davis, Assist. U.S. Atty, (Roslynn R. Mauskopf, U.S. Atty.), Brooklyn, NY, for U.S.

Donald Bierman, Scholat & Sale, Miami, FL, for defendants.

### MEMORANDUM

KORMAN, Chief Judge.

Ezra Sasson and Zakay Sasson have been charged in a two count superseding indictment for their alleged participation in a money laundering conspiracy. Count One alleges that, from September 1999 until December 2002, the Sassons, along with three other co-defendants, conspired to conduct financial transactions involving the proceeds of specified unlawful activity, namely narcotics trafficking in violation of 21 U.S.C. §§ 841(a) and 846, and that those transactions were designed to conceal the nature, location, source, ownership and control of the proceeds of said narcotics trafficking, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Count Two alleges that, during the same time period, the Sassons, along with nine other co-defendants, knowingly conducted, controlled, managed, supervised, directed, and owned all or part of an unlicensed money transmitting business, in violation of 18 U.S.C. §§ 1960, 1962, and §§ 3551 et seq. They are pending trial.

On March 25, 2004, the Sassons moved to suppress all evidence that the United States Attorney has obtained through a wiretap placed on the cellular phone of one of their co-defendants, Natan Banda. In 1993, some nine years before the wiretap application was submitted, the Sassons had engaged in informal proffer sessions with a different United States Attorney in connection with a different crime. Before the proffer sessions, the Sassons had received assurances that any statements would be given pursuant to the derivative use provisions of 18 U.S.C. § 6002, and after the sessions, they were awarded transactional immunity for their past crime. The Sassons now contend that the wiretap application in this case relied on statements they had made in the informal proffer sessions nine years earlier. Consequently, they claim that the admission at trial of evidence procured through the wiretap would violate their Fifth Amendment privilege against self-incrimination. At oral argument held on July 13, 2004, I denied the Sassons' motion.

I write here to explain my reasoning more fully. The Sassons argue that they received the same use and derivative use immunity that they would have received had their testimony been compelled and that they therefore spoke at the proffer sessions with the assurance that (1) the immunized statements would never be used in the investigation of a future crime, and (2) if they were used, any resulting fruits of those statements would have to be suppressed. As Justice Frankfurter observed in *Nardone v. United States*, 308 U.S. 338, 340, 60 S.Ct. 266, 84 L.Ed. 307 (1939), "[a]ny claim for the exclusion of evidence logically relevant in criminal prosecutions is heavily handicapped. It must be justified by an over-riding public policy expressed in the Constitution or the law of the land." There is no such policy that supports the Sassons' argument in the circumstances of this case.

### Background

In September 1992, federal authorities performed a routine car stop in northern Florida and seized $1.7 million in cash from Ezra Sasson. During the ensuing investigation, Ezra Sasson and his brother, Zakay Sasson, decided to cooperate with the United States Attorney for the Northern District of Florida. They became witnesses in an ongoing criminal investigation of a Colombia-based cocaine trafficker for whom they had laundered money. Neither Ezra Sasson nor Zakay Sasson was compelled to testify against himself. To

the contrary, the Sassons provided their assistance in the hopes of receiving transactional immunity, or agreements of nonprosecution. Because the United States Attorney needed assurance that the Sassons had information sufficiently valuable to trade for transactional immunity, he needed to first hold a proffer session. On the other hand, the Sassons needed assurance that, if the proffer was found wanting, their statements would not be used to prosecute them for crimes they disclosed. The use immunity, as correspondence between the Sassons and the United States Attorney demonstrates, was simply an interim step by which the Sassons hoped to secure transactional immunity.

On November 2, 1993, Assistant United States Attorney Steven P. Preisser memorialized an invitation to engage in immunized proffer sessions in a letter to Ezra Sasson's attorney. It stated:

> Ezra Sasson has agreed to meet with agents of the Drug Enforcement Administration and Internal Revenue Service/CID and to provide a detailed debriefing to those agents ... The debriefing will be given pursuant to the restrictions found in Rule 11(e)(6) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence and the derivative use provisions of Title 18, U.S.C. § 6002.

Notice of Motion, Exhibit B (Letter, dated November 2, 1993). The letter also made clear that, if the United States Attorney was satisfied with the value of Ezra Sasson's cooperation, he and his family would be given transactional immunity.

> If, after [ ] Ezra Sasson has been debriefed, the Office of the U.S. Attorney is of the opinion that Ezra Sasson has been totally candid and truthful in his disclosures and if the Office of the U.S. Attorney deems the information provided by Ezra Sasson to be of sufficient

detail and value to warrant an investigation and/or prosecution of other individuals, then this Office would agree that Ezra Sasson, his wife Marlyn Sredni Sasson and his brother Zakay Sasson would not be subject to criminal prosecution within this district for the conduct occurring in this district on or about September 19, 1992 [the cash seizure].

*Id.* Regardless of whether or not the United States Attorney was ultimately willing to extend transactional immunity, however, Ezra Sasson would receive use immunity for his statements.

After the initial proffer session, the United States Attorney for the Northern District of Florida was apparently satisfied with Ezra Sasson's candor and level of cooperation. Thus, the informal immunity agreement was confirmed and memorialized in a letter to Ezra and Zakay Sasson:

> I am writing in follow up of my letter of November 2, 1993. EZRA SASSON has met with agents of the Drug Enforcement Administration and the Internal Revenue Service/CID and has provided a debriefing to those agents. Based upon the limited information provided to me by those agents and by the monitoring Assistant United States Attorney in Tallahassee, FL, it is my judgment that the United States would agree to the negotiated settlement as set forth in its November 2, 1993, letter. Specifically, the United States Attorney for the Northern District of Florida agrees that EZRA SASSON will not be subject to prosecution for the conduct occurring in this district on or about September 19, 1992.

Notice of Motion, Exhibit B (Letter, dated December 6, 1993). The second letter also confirmed the immunity provisions of the agreement:

> All statements given by EZRA SASSON will be as delineated in the November 2,

1993, letter. You of course recognized that this office can not bind other offices relative to the non-prosecution agreement. However, I believe that the November 2, 1993, letter does protect EZRA SASSON as it pertains to the use of any statements that he might provide to agents in furtherance of this agreement.

*Id.* Finally, the letter explicitly extended the entire immunity agreement from Ezra Sasson to Zakay Sasson:

In order to facilitate an orderly disposition of these matters, this office is also willing to extend the same offer to ZAKAY SASSON. Specifically, any information provided by ZAKAY SASSON will be given pursuant to the restrictions found in 11(e)(6) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, and the derivative use provisions of Title 18, United States Code, Section 6002.

*Id.* The Sassons' cooperation ultimately led to indictments against two of their coconspirators, Beatriz Dror and Carlos Kipershmit, and Ezra Sasson testified before the grand jury and at the sentencing of Ms. Dror. *See* Notice of Motion, Exhibit C; Defendants' Memorandum of Law, at 6. As a result, neither Ezra Sasson nor Zakay Sasson was ever charged with a criminal offense arising out of the 1992 cash seizure or their confessed money laundering activity.

Some eight years after the Sassons engaged in their principal proffer sessions, in November 2001, the United States Attorney for the Eastern District of New York began to investigate Ezra and Zakay Sasson's current co-defendant, Natan Banda, for an unrelated money laundering scheme. The Drug Enforcement Agency reported to investigators that it had learned from Dutch police that Banda was negotiating with Amsterdam-based drug traffickers to launder the proceeds of narcotics sales through Houston, Texas. *See* Notice of Motion, Exhibit F, at 5 (Letter Brief from Jonathan E. Davis to Judge Sifton in continued support of wiretap, dated July 15, 2002, hereafter "Letter Brief"). Then, in December 2001, investigators learned that an associate of Banda named Menachem Cohen had confirmed with the Israel National Police that Banda had laundered hundreds of thousands of dollars for the Amsterdam-based drug traffickers, and that Banda laundered money for a living. *Id.* Finally, investigators learned from the United States Customs Service that in August 2001, Customs inspectors had found Banda with a cash-counting machine concealed in his luggage upon returning to the United States from Amsterdam. *Id.*

These facts led the United States Attorney's Office for the Eastern District of New York to begin analyzing the call activity of Banda's cellular phone. *Id.* The phone's records confirmed that Banda had used his cellular phone to communicate with the Amsterdam-based drug traffickers, wholesale customers in Houston, and a courier service for high-value items in Houston. *Id.* Additionally, they revealed that Banda had been in frequent contact with telephones registered to Zakay Sasson and his company, National Electronics, and that all had been in contact with New York cellular phones registered in the name Moses Dafkal. *Id.* Upon further investigation, the United States Attorney decided to seek a wiretap on Banda's cellular phone before Judge Sifton. The affidavit in support of the wiretap application was signed on May 15, 2002, by Matthew Coleman, a Special Agent with the DEA, and was approved by Judge Sifton the same day. *See* Notice of Motion, Exhibit A. The consequent wiretap recorded several conversations involving the Sassons that

the United States Attorney now seeks to admit as evidence against them.

### Discussion

#### I. Whether the inclusion of immunized testimony in wiretap application prevents the use of wiretap evidence against the Sassons

Ezra and Zakay Sasson claim that, if the United States Attorney is permitted to present evidence obtained through its wiretap on Banda's telephone, their Fifth Amendment rights would be violated. Their argument is that, in the affidavit in support of a wiretap, the United States Attorney "relied upon testimony and information which had been given by Ezra Sasson and Zakay Sasson to agents of the United States government under a grant of full use and derivative use immunity." Defendants' Mem. at 2. They continue: "[T]he inclusion of this information in the Coleman affidavit to establish probable cause to issue the wiretap order against the Sassons, amounted to the unlawful use of their immunized testimony against them, and irrevocably tainted all of the evidence obtained as a result of the wiretap." *Id.*

It is undisputed that the affidavit provided in support of the wiretap contained information gleaned as a result of immunity agreements with the Sassons. In paragraphs 23 and 24 of the affidavit, Special Agent Coleman described the Sassons and their relationship to the alleged money laundering scheme. He wrote:

23. From September 1, 2001 and continuing through May 1, 2002 inclusive, there have been more than 130 calls, often in excess of five per week, between the SUBJECT CELLULAR TELEPHONE and telephones in Florida (the "SASSON TELEPHONES") subscribed to by the SUBJECT INTERCEPTEE and SUBJECT INDIVIDUAL ZAKAY SASSON and/or by the SUBJECT NATIONAL ELECTRONICS. NATIONAL ELECTRONICS is an electronics import-export company operated by ZAKAY with his brother, the SUBJECT INDIVIDUAL EZRA SASSON. Since January 2002, the SASSON TELEPHONES are the principal numbers in Florida that the SUBJECT CELLULAR TELEPHONE has called.

24. The SASSON brothers are natives of Israel who reside in Florida, maintain both Israeli and Venezuelan citizenship and make frequent trips abroad. Although neither brother has a criminal record, their prior known links to money-laundering and drug-trafficking are substantial:

a. In September 1992, federal agents seized $1.7 million in cash from EZRA SASSON during a car stop in northern Florida;

b. EZRA SASSON was debriefed by DEA agents during a December 1993 proffer session; EZRA admitted that in early 1992, he and his brother ZAKAY had been hired by a drug trafficker based in Cali, Colombia, to launder cash that the trafficker would arrange to have delivered to them in the U.S.;

c. EZRA further admitted that in 1992, he and ZAKAY had arranged on the trafficker's behalf for the pick-up of large amounts of cash from Houston on three occasions and from Los Angeles on three other occasions, all of which was transported to Miami, then either hand-carried on flights out of the U.S. or wire-transferred to the U.S. bank accounts of Latin American companies;

d. EZRA stated that he had made three of six pick-ups himself, and that on the remaining three, the pick-ups had been made by ZAKAY and other employees of Zeus Distributors, another

import-export company run by the SAS-SONS;

e. In a proffer session in February 1994, ZAKAY SASSON admitted to meet with his brother EZRA and the trafficker in Cali in early 1992 and to picking up cash in Houston for the trafficker on two occasions in mid–1992; ZAKAY further stated that he had carried the first cash pick-up to Guatemala, converted some of it to cashier's checks, which he carried back in to the U.S.; and that on the second occasion, he had carried $380,000 on a flight from Florida to Israel; he had then deposited it in an Israeli bank account, then wired the $380,000 to an account in New York City, from which he then wired to an account in Cali;

f. In or about April 1995, the Sassons' company NATIONAL ELECTRONICS imported electrical transformers from Colombia to the United States; upon searching the transformers, U.S. Customs inspectors discovered 84 kilograms of cocaine hidden inside (no arrests resulted from this seizure); and

g. In or about September 2000, Colombian customs officials advised USCS that they had acquired evidence that NATIONAL ELECTRONICS was knowingly laundering money by exporting merchandise from the U.S. to Colombia that had been paid for with drug dollars bought at discount (a technique sometimes referred to as the "black market peso exchange").

Affidavit, at ¶¶ 23–24. The information included in paragraph 23 was derived solely from the investigations of Banda. Some of the information included in paragraph 24, however, which was used to show that the Sassons had a known connection to money laundering, was primarily derived from the immunized proffer sessions. Specifically, subparagraphs 24(b) through 24(e) all contained information provided by the Sassons to investigators under cover of immunity. Indeed, the affidavit explicitly refers to the proffer sessions in which the Sassons engaged and to statements they made.

There were also later mentions of the Sassons in the affidavit that may have been influenced by the immunized testimony. For example, in referring to a number of telephone calls, Special Agent Coleman wrote that the contacts between Banda's phone and co-defendant Avi Cohen's phone, and the telephones of the Sassons, National Electronics and co-defendant Gal Kofferberg, "all of whom have previous, substantial ties to money laundering and/or narcotics trafficking," implicate Banda in those activities as well. Affidavit, ¶ 23. Later, Special Agent Coleman implied that the Sassons were "known money launderers." *Id.* at ¶ 31. *See also id.* at ¶ 58 (referring to National Electronics as a company that "has previously been implicated in the concealment of drug proceeds" through money laundering). While less explicitly based on immunized testimony, these descriptions of the Sassons as money launderers were presumably in part rooted in the Sassons' cooperation from nine years earlier and in part on the facts alleged in subparagraphs 24(f) and 24(g).

The United States Attorney claims that the inclusion of immunized material in the wiretap application was inadvertent. *See* Letter Brief, at 1–2. While the United States Attorney for the Eastern District of New York was in possession of the DEA debriefing reports completed after the Sassons' proffer sessions in 1993, it was not until July 11, 2002 (after the wiretap order had issued), that its investigators "learned to our surprise" that the Sassons had "received informal assurances of use immunity from the U.S. Attorney's Office for the Northern District of Florida." *Id.*

at 1. The debriefing summaries noted that the information was provided "pursuant to a written agreement," but did not suggest that the agreement was one of full use and derivative use immunity. *See* Notice of Motion, Exhibit D and E (DEA debriefing summaries); Letter Brief, at 7. Moreover, no court order had ever been issued granting the Sassons immunity, and the United States Attorney for the Northern District of Florida had never sought permission from the Department of Justice (DOJ) for the immunity it granted—thus, there had been no record of it in the witness immunity section of the DOJ. Letter Brief, at 4. While this certainly should influence how far we stretch to deter what took place here, it is not ultimately the issue.

▮ When a defendant has provided information with a grant of immunity under 18 U.S.C. § 6002, he "shift[s] to the government the heavy burden of proving that all of the evidence it proposes to use [against him] was derived from legitimate independent sources." *Kastigar v. United States*, 406 U.S. 441, 461–62, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). This is because the immunity provided for in § 6002 must be read as coextensive with the privilege against self-incrimination provided in the Fifth Amendment. *Id.* at 448, 92 S.Ct. 1653. Here, the testimony was informally provided under such a grant. But because the written proffer agreements were clear, it is insignificant that the prosecutors did not follow the specific procedures of 18 U.S.C. §§ 6001–6005. *See United States v. Winter*, 663 F.2d 1120 (1st Cir.1981); *United States v. Pelletier*, 898 F.2d 297 (2d Cir.1990). The United States Attorney was bound by contract and, in turn, a statutory analog of the Fifth Amendment, that "no testimony or other information compelled under the [agreement] (or any information directly or indirectly derived from such testimony or other information)

may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order." 18 U.S.C. § 6002.

▮ Defense counsel argues as follows: "Plainly, Special Agent Coleman's affidavit, submitted in support of the government's application for the wiretap that eventually resulted in the seizure of the Sassons' communications, actually used the Sassons' immunized proffer statements." Defendants' Mem. at 16. Thus, he claims, "[t]his use, insofar as the prosecution of the Sassons is concerned, violates the Sassons' Fifth Amendment rights." *Id.* In resolving this argument, it is necessary to consider whether the evidence the United States Attorney seeks to offer at trial was tainted by immunized statements. The method is as follows: "Under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), a reviewing court must examine the unchallenged portions of the affidavit and determine whether those portions are sufficient to support a probable cause finding." *United States v. Gallo*, 859 F.2d 1078, 1083–84 (2d Cir.1988). And as defense counsel points out, the standard is strict: Suppression of any conversations recorded is required unless the United States Attorney can show that "the use was harmless beyond a reasonable doubt in the sense that the immunized testimony was so inconsequential that it could not have influenced either the government's decision to request search warrants or the issuing Magistrate's decision to grant them." Defendants' Mem. at 18 (quoting *United States v. Nanni*, 59 F.3d 1425, 1443 (2d Cir.1995)). While defense counsel correctly observes that there is a heavy burden on the prosecution to show that any use of the immunized testimony was harmless beyond a reasonable doubt, he ignores the relevant underlying standard for seek-

ing and granting a warrant—a standard that makes the United States Attorney's burden far less insurmountable. For Judge Sifton to grant the warrant, he only had to find probable cause.

■ Probable cause requires only facts sufficient to " 'warrant a man of reasonable caution in the belief' " that an offense has been committed; "it does not demand any showing that such a belief be correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925)). The Supreme Court has repeatedly emphasized:

> In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.... The rule of probable cause is a practical, nontechnical conception....

*Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). Thus, I must only consider whether the included immunized statements were so inconsequential that Judge Sifton would have, beyond a reasonable doubt, found a *probability* of criminal activity without their inclusion.

■ As I explained at oral argument, "this warrant would have issued if no reference had been made to ... the briefing statements that [the Sassons] had made ten years earlier." Transcript of Oral Argument, July 13, 2004, at 31. Included in the 80–page affidavit "was ample probable cause to issue the warrant and to listen in on their conversations which was what the warrant authorized." *Id.* Defendants argue that the non-immunized portions of the affidavit did not "refer[ ] to Zakay Sasson, and taken together, are a far cry

from establishing probable cause as to either Ezra Sasson or National Electronics." Notice of Motion, at 7. Passing over whether this is accurate, the wiretap application did not seek authorization to tap the phones of either the Sassons or National Electronics. Instead, it sought to tap the phone of Natan Banda, and there was more than a sufficient factual basis to establish probable cause for that purpose even without the immunized testimony. Indeed, this is why Judge Sifton continued the warrant after being told that the original affidavit made reference to immunized testimony.

The probable cause included the facts that initially led to the United States Attorney's investigation: The DEA had learned that Banda was negotiating with Amsterdam-based drug traffickers to launder the proceeds of narcotics sales. *See* Affidavit, at ¶ 15. These were not idle suspicions; they were the result of court-authorized electronic eavesdropping where the Dutch police overheard Banda and two associates making arrangements to smuggle large volumes of ecstacy to Houston, Texas and elsewhere. *Id.* Three of Banda's associates, Dror Fahime, Jacob Elchik, and Menachem Cohen, were ultimately arrested in November 2001 in Holland, Australia, and Israel, respectively. *Id.* at ¶ 16. Investigators learned that Cohen had confirmed with the Israel National Police that Banda laundered money for a living and had laundered hundreds of thousands of dollars for the Amsterdam-based drug traffickers. *Id.* Even Banda's brother told the Israel National Police that he knew his brother to "deal with money for a living." *Id.* Finally, Customs inspectors had found Banda with a cash-counting machine concealed in his luggage upon returning to the United States from Amsterdam, a machine he claimed was for work on Wall Street. *Id.*

at ¶ 14. These independent leads may have been sufficient on their own to establish probable cause, but there was still more.

Investigators found that Banda lived in a luxury apartment in Brooklyn Heights and drove a new Cadillac. Affidavit, at ¶ 13. On his leasing application for the apartment he claimed to be the self-employed principal of "Fifth Avenue Hedge Fund" of Brooklyn, and on the application for the car he wrote that he was President of "Poly Star Bag" in Brooklyn. Id. No trace of either business could be found— neither had ever been registered in New York State. Id. Moreover, between September 2001 and May, 2002, Banda had moved more than $4 million into and out of a personal checking account in a bank directly across the street from his luxury Brooklyn apartment. Id. at ¶ 18. Only a small portion of that went to cover his $4000 per month rent, which Banda paid in $500 money orders (that, under federal law, would not have to be reported by the bank because they were less than $3000). Id. at ¶ 17. A similar level of activity, also consistent with money laundering, was found in bank records of an account nominally maintained in trust for Banda's parents. Id. at ¶¶ 19–20. When these facts were put together with the fact that Banda's cellular phone records revealed frequent communications with phones registered to the Amsterdam-based drug traffickers, wholesale customers in Houston, and a Houston based courier service, there was ample probable cause to issue the wiretap sought by the United States Attorney.

Significantly, the recorded conversations that the United States Attorney now seeks to introduce against the Sassons would have been recorded even if the wiretap affidavit had made no mention of the Sassons or a desire to target them. The identification of the Sassons was only necessary because of the specific requirements of the Title III of the Omnibus Crime Control and Safe Streets Act of 1968. That statute requires the United States Attorney to provide a description of the facilities from which communications are to be intercepted, and also "the identity of the person, if known, committing the offense and whose communications are to be intercepted." 18 U.S.C. 2518(1)(b)(iv). This does not only refer to the wiretap's primary target. The United States Attorney must provide the name of any person "when the law enforcement authorities have probable cause to believe that that individual is 'committing the offense' for which the wiretap is sought," United States v. Kahn, 415 U.S. 143, 155, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974), and it "expects to intercept the individual's conversations over the target telephone." United States v. Donovan, 429 U.S. 413, 428, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977).

■ The identification requirement was included in Title III because of the erroneous premise that it was required by the Fourth Amendment, and the Supreme Court has held that, "nothing in the legislative history suggests that Congress intended this broad identification requirement to play 'a central, or even functional, role in guarding against unwarranted use of wiretapping or electronic surveillance.'" Donovan, 429 U.S. at 437, 97 S.Ct. 658 (quoting United States v. Chavez, 416 U.S. 562, 578, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974)). This is significant because once the necessity for the identification requirement is properly understood, it is clear that compliance with it plays no role in a decision whether the wiretap should be authorized as to identified individuals. Indeed, for this reason, wiretap evidence procured against a defendant will not be suppressed based on a failure by the Unit-

ed States Attorney to list his name in a wiretap application. *See Donovan,* 429 U.S. at 435, 97 S.Ct. 658 (stating that "the failure to identify additional persons who are likely to be overheard engaging in incriminating conversations could hardly invalidate an otherwise lawful judicial authorization" of a wiretap). In this case, it is simply not relevant for exclusionary rule purposes whether there was sufficient untainted evidence included in the wiretap application to identify the Sassons as individuals against whom there was probable cause. The warrant would have issued as long as the information in the wiretap application that was tainted as to the Sassons was not critical to establishing probable cause as to Banda—clearly it was not.

Because there was clear independent probable cause to place a wiretap on Banda's phone the wiretap would have issued and eavesdropping would have begun regardless of any statements about the Sassons. And as I explained at oral argument:

> [I]nevitably, in the course of such an eavesdropping which would have been totally lawful, they would have come upon these conversations of the [Sassons] since they—before they minimize by stopping to tape or by stopping to listen, they're permitted to listen to conversations to determine whether or not they're relevant to what would be entitled to intercept in any event.

Transcript of Oral Argument, July 13, 2004, at 32. This is analogous to the "inevitable discovery" exception to the exclusionary rule that is applied to Fourth Amendment violations. With respect to that rule, the Supreme Court has written:

> The ultimate or inevitable discovery exception to the exclusionary rule is closely related in purpose to the harmless-error rule of *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d

705 (1967). The harmless-constitutional-error rule "serve[s] a very useful purpose insofar as [it] block[s] setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial." The purpose of the inevitable discovery rule is to block setting aside convictions that would have been obtained without police misconduct.

*Nix v. Williams,* 467 U.S. 431, 444 n. 4, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Similarly here, the wiretap evidence will not be excluded because the evidence would have been obtained even without the use of the statements made at the proffer sessions.

Finally, even if probable cause were necessary against the Sassons and the inevitable discovery rule did not apply, there *was* probable cause to target the Sassons and their company absent any reference to immunized testimony. There were a number of independent facts known or discovered at the outset of investigation. First, Ezra Sasson had been caught with $1.7 million in cash years before—surely suspicious behavior. *Id.* at ¶ 24(a). Second, Colombian customs officials had advised investigators that the Sassons' company had laundered money by exporting merchandise bought with drug money from the United States to Colombia. *Id.* at ¶ 24(g). And third, the affidavit alleged that the Sassons' company had been caught attempting to import 84 kilograms of cocaine. *Id.* at ¶ 24(f). As the United States Attorney now concedes, the allegation regarding the importation of cocaine was factually incorrect; it pertained not to the Sassons' company, National Electronics, but to a wholly separate company called National Electric of Miami. *See* Notice of Motion, Exhibit G. Nevertheless, given the closeness of the companies' names and the Sassons' former connection with cocaine

trafficking, there is no reason to believe that this error was made in bad faith. Thus, the error does not affect a post-issuance review of whether, on its face, there was sufficient probable cause to grant the warrant. *See Franks v. Delaware*, 438 U.S. 154, 155, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) (explaining that only when "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" must it be excluded when performing an ex-post review of whether there was probable cause to issue the warrant).

More important for establishing probable cause against the Sassons, however, was the fact that initial pre-wiretap investigations revealed that Banda had made in excess of five telephone calls per week to the Sassons or their company during the period of their alleged money laundering scheme. Affidavit, at ¶ 23. The timing of these phone calls was detailed in the affidavit. *See id.* at ¶¶ 31–39. Revealingly, the calls were clustered around Banda's particularly suspicious behavior. *Id.* In short, the warrant application provided probable cause to justify the interception of the Sassons' conversations even without reference to the immunized proffer statements.

The Sassons are currently in "substantially the same position" with respect to the currently charged crime as they would have been in had they not provided immunized statements in 1992. *See Kastigar*, 406 U.S. at 462, 92 S.Ct. 1653. Indeed, they may be in a better position. Because the Sassons decided to cooperate with the United States Attorney for the Northern District of Florida and to engage in proffer sessions in 1993, they received transactional and use immunity. This was more than they would have been entitled to had they been compelled to testify, and it may have allowed them to avoid prosecution for their earlier crimes. It also did not harm them in their current defense. In *United States v. Gallo*, 859 F.2d 1078 (2d Cir.1988), Judge Winter wrote: "While it is of utmost importance that the government respect and scrupulously observe restrictions on the use of immunized testimony, I see no reason to set aside an otherwise valid conviction because of an error that had no effect on the course of events." *Id.* at 1084. Nor can I see any reason to set aside relevant evidence because of an error that had no effect on the course of events. The evidence resulting from the wiretaps will not be suppressed.

## II. Whether the use of immunized testimony to investigate a future crime could ever violate Fifth Amendment

■ Although I denied defendants' motion to suppress for the reasons set forth in Part I, there is a separate argument for denial that warrants discussion. Again, defendants are claiming that they enjoyed statutory immunity based on a contract. But that statutory immunity has been held to be necessarily coextensive with the level of immunity needed to overcome the privilege against self-incrimination provided in the Fifth Amendment. *See Kastigar*, 406 U.S. at 448, 92 S.Ct. 1653. Thus, defendants are implicitly arguing that, because of the Self–Incrimination Clause, they could never have been forced to testify if that testimony could be used to lead to evidence that would incriminate them for a future crime. Put differently, they claim that because they agreed to provide information in exchange for the level of immunity that would have allowed their statements to be compelled, they must have been speaking with the assurance that whatever they said could never be used against them, *and* that a prohibition on the use of the "fruit of the poisonous tree" would necessarily extend indefinitely to

prosecutions for crimes committed long after the proffer sessions.

This argument is a far cry from the text of the Self–Incrimination Clause, which states only that no person "shall be compelled in any criminal case to be a witness against himself." Indeed, it is such a stretch from the text that it calls for an examination of the foundation on which the clause and its exclusionary rule are based. *See United States v. Patane,* —— U.S. ——, 124 S.Ct. 2620, 2628, 159 L.Ed.2d 667 (2004) (plurality opinion) (Thomas, J.) (reiterating the Supreme Court's "continued insistence that the closest possible fit be maintained between the Self–Incrimination Clause and any rule designed to protect it."). Simply put, none of the values recognized as underlying the privilege against self-incrimination are implicated by the admission of evidence that is derived from immunized statements that were provided in a separate case nearly a decade earlier. First, however, I turn to the historical basis for applying the fruit of the poisonous tree doctrine to the privilege to show that it too, cannot justify extending the branches of the poisonous tree this far.

### a. The basis for applying a fruit of the poisonous tree doctrine to violations of the Self–Incrimination Clause

As a historical matter, the privilege against self-incrimination was aimed at the evils of the Inquisition and the Star Chamber. *See generally Ullmann v. United States,* 350 U.S. 422, 428, 76 S.Ct. 497, 100 L.Ed. 511 (1956); *Brown v. Walker,* 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896); VIII Wigmore, *Evidence,* § 2250; Henry J. Friendly, *Benchmarks,* pp. 270–71 (1967); Leonard W. Levy, *The Origins of the Fifth Amendment, the Right Against Self–Incrimination* (1968). It sought to address these evils by prohibiting the government from compelling incriminating testimony from a defendant in a criminal case. *See Murphy v. Waterfront Commission,* 378 U.S. 52, 75–76, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). It did not, of course, bar all adversarial tactics that may be used to incriminate a defendant. "The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it." *Schmerber v. California,* 384 U.S. 757, 764, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

From the outset, the Supreme Court could have determined that, while compelled responses of an accused are "testimonial" and should be barred from trial, any leads or evidence derived therefrom, which are not themselves "testimonial" statements of the accused, should be recognized as outside the protective scope of the Self–Incrimination Clause. Such a rule would have been logically consistent with the Supreme Court's holding in *Schmerber,* where it determined that a defendant forced to provide a blood sample was not made a "witness against himself." 384 U.S. at 761, 86 S.Ct. 1826. It would also have been consistent with the common law existing at the time of the Constitution, when it was settled that fruits of improperly obtained confessions were admissible at the trial of the accused. *See The King v. Warickshall,* 1 Leach 263, 168 Eng. Rep. 234 (1783); *The King v. Lockhart,* 1 Leach 386, 168 Eng. Rep. 295 (1785). Nevertheless, since *Counselman v. Hitchcock,* 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892), it has been presumed that the privilege against self-incrimination protects a person from being compelled to give testimony if that testimony could be used directly to convict him of a crime *or* if it could lead to the discovery of other evidence that could be used to convict him. The roots of this strange presumption may

shed light on the famous statement of Justice Frankfurter that, "[t]he privilege against self-incrimination is a specific provision of which it is particularly true that 'a page of history is worth a volume of logic.'" *Ullmann v. United States,* 350 422, 438, 76 S.Ct. 497, 100 L.Ed. 511 (1956) (quoting *New York Trust Co. v. Eisner,* 256 U.S. 345, 349, 41 S.Ct. 506, 65 L.Ed. 963 (1921) (Holmes, J.)).

The decision in *Counselman* arose after a defendant was held in contempt for refusing to answer questions before a grand jury in spite of being offered immunity under a then-existing statute. 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110. The immunity statute "protected him against the use of his testimony against him or his property in any prosecution against him or his property," but did not "prevent the use of his testimony to search out other testimony to be used in evidence against him or his property, in a criminal proceeding in such court." *Id.* at 564, 12 S.Ct. 195. In other words, it protected against the use of compelled testimony, but not its fruits. The Court recognized that to justify a contempt conviction for refusing to answer questions, the immunity provided to the defendant had to remove the fear of incrimination coextensive with the privilege in the Fifth Amendment. *Id.* at 565, 12 S.Ct. 195. Thus, the Court proceeded to consider what the Fifth Amendment required. It instructed that, "[t]he privilege is limited to criminal matters, but it is as broad as the mischief against which it seeks to guard." *Id.* at 562, 12 S.Ct. 195. Ironically, it never defined the mischief.

Rather than perform a legal analysis based on bedrock legal principles or policies, Justice Blatchford, writing for a unanimous Court, began by performing an exhaustive but inconclusive review of state court holdings that had discussed this issue in construing their own state constitutions. This exercise revealed a basic and unsurprising dichotomy: State courts that had construed constitutional provisions worded in language substantially similar to the Fifth Amendment had held that grants of limited use immunity would suffice to overcome the claim of privilege,[1] whereas state courts that had construed constitutional provisions providing protections to witnesses against being compelled to "accuse or furnish evidence against himself" (as opposed to merely affording the privilege against being compelled to be a witness against one's self), had held that a grant of limited use immunity was not enough.[2]

1. An example of such a case is *People ex rel. Hackley v. Kelly,* 24 N.Y. 74, 83–84 (1861), where the New York Court of Appeals held:

"If a man cannot give evidence upon the trial of another person without disclosing circumstances which will make his own guilt apparent or at least capable of proof, though his account of the transactions should never be used as evidence, it is the misfortune of his condition and not any want of humanity in the law. If a witness objects to a question on the ground that an answer would criminate himself, he must allege, in substance, that his answer, if repeated as his admission on his own trial, would tend to prove him guilty of a criminal offence. If the case is so situated that a repetition of it on a prosecution against him is impossible, as where it is forbidden by a positive statute, I have seen no authority which holds or intimates that the witness is privileged. It is not within any reasonable construction of the language of the constitutional provision. The term 'criminal case,' used in the clause, must be allowed some meaning, and none can be conceived other than a prosecution for a criminal offence."

2. An example of such a case is *Emery's Case,* 107 Mass. 172, 182 (1871), where the Supreme Judicial Court of Massachusetts held:

"The third branch of the provision in the Constitution of Massachusetts, 'or furnish evidence against himself,' must be equally extensive in its application; and, in its interpretation, may be presumed to be intended to add something to the significance of that which

After reviewing these cases at some length, Justice Blatchford wrote:

> [A]s the manifest purpose of the constitutional provisions, both of the states and of the United States, is to prohibit the compelling of testimony of a self-criminating kind from a party or a witness, the liberal construction which must be placed upon constitutional provisions for the protection of personal rights would seem to require that the constitutional guaranties, however differently worded, should have as far as possible the same interpretation; and that where the constitution, as in the cases of Massachusetts and New Hampshire, declares that the subject shall not be "compelled to accuse or furnish evidence against himself," such a provision should not have a different interpretation from that which belongs to constitutions like those of the United States and of New York, which declare that no person shall be "compelled in any criminal case to be a witness against himself."

142 U.S. at 584–85, 12 S.Ct. 195. Then, having swiftly determined that there needed to be a uniform rule, the Court concluded:

> Under the rulings above referred to by Chief Justice Marshall and by this court, and those in Massachusetts, New Hampshire, and Virginia, the judgment of the circuit court in the present case cannot be sustained. It is a reasonable construction, we think, of the constitutional provision, that the witness is protected "from being compelled to disclose the circumstances of his offense, the sources from which, or the means by which, evidence of its commission, or of his connection with it, may be obtained, or made effectual for his conviction, without using his answers as direct admissions against him."

*Id.* at 585, 12 S.Ct. 195 (quoting *Emery's Case,* 107 Mass. 172, 182). Simply put, this reasoning is inadequate to justify the domino effect it has created. The rulings of "Chief Justice Marshall and by [the Supreme Court], and those in [the state courts]" on which Justice Blatchford relied fail to provide justification for the breadth of his holding.

The referenced ruling of Chief Justice Marshall was *United States v. Burr,* No. 14692E, 25 F. Cas. 38 (C.C.D.Va.1807), which stood only for the proposition that a witness cannot be compelled to give testimony which is itself sufficient to convict him or which would form a "link" in the "chain of *testimony* which is necessary to convict any individual of a crime." *Id.* at 40 (emphasis added). There was plainly no suggestion in *Burr* that a witness could refuse to answer a question if his response might lead to other non-testimonial evidence. The referenced ruling of the Supreme Court on which Justice Blatchford relied was *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

precedes. Aside from this consideration, and upon the language of the proposition standing by itself, it is a reasonable construction to hold that it protects a person from being compelled to disclose the circumstances of his offence, the sources from which, or the means by which evidence of its commission, or of his connection with it, may be obtained, or made effectual for his conviction, without using his answers as direct admissions against him. For all practical purposes, such disclosures would have the effect to furnish evidence against the party making them. They might furnish the only means of discovering the names of those who could give evidence concerning the transaction, the instrument by which a crime' was perpetrated, or even the corpus delicti itself. Both the reason upon which the rule is founded, and the terms in which it is expressed, forbid that it should be limited to confessions of guilt, or statements which may be proved, in subsequent prosecutions, as admissions of facts sought to be established therein."

*Boyd* set out the now discredited "mere evidence" rule and focused on the extent of the Fourth Amendment's protection from unreasonable searches and seizures. While it stated that the compelled seizure of a defendant's papers could be a Fifth Amendment violation, that holding was based only on the notion that, by responding to a compelled subpoena, a defendant would be announcing that those papers were his—not because those papers were the fruit of compelled testimony. *See United States v. Hubbell,* 530 U.S. 27, 36, 120 S.Ct. 2037, 147 L.Ed.2d 24 (2000). And finally, the rulings of Massachusetts, New Hampshire and Virginia, on which Justice Blatchford apparently placed principal reliance, can be easily distinguished by the peculiar language of the self-incrimination clauses those state courts were interpreting. If anything, these state court rulings should have suggested that the proper interpretation of the Fifth Amendment's Self–Incrimination Clause was that limited use immunity alone is enough to overcome the privilege.

In sum, the Supreme Court's entire basis for holding that the privilege against self-incrimination protected criminal defendants from the use of evidence derived from compelled statements was that it was what some previous courts had suggested on plainly distinguishable facts. The Court provided no independent reasoning for its sweeping holding. Still, it proceeded to state in dictum, in even more sweeping terms, that testimony could only be compelled where complete transactional immunity had been provided:

> We are clearly of opinion that no statute which leaves the party or witness subject to prosecution after he answers the criminating question put to him can have the effect of supplanting the privilege conferred by the constitution of the United States.... In view of the constitutional provision, a statutory enact-

ment, to be valid, must afford absolute immunity against future prosecution for the offense to which the question relates.

142 U.S. at 585–86, 12 S.Ct. 195.

With such sparse justification, it is not surprising that *Counselman* was severely criticized. *See, e.g.,* Corwin, *The Supreme Court's Construction of the Self–Incrimination Clause,* 29 Mich. L.Rev. 1, 205–06 (1930). Nevertheless, for decades after *Counselman,* it was presumed that to compel testimony over the assertion of a Fifth Amendment privilege, prosecutors had to grant full transactional immunity. Then, in *Murphy v. Waterfront Commission,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), the Supreme Court was forced to revisit the issue when it considered "whether, absent an immunity provision, one jurisdiction in our federal structure may compel a witness to give testimony which might incriminate him under the laws of another jurisdiction." *Id.* at 54, 84 S.Ct. 1594. Of course, state prosecutors were unable to provide transactional immunity from prosecution in a federal forum and could therefore not practicably adhere to the dictum of *Counselman.* After reviewing the policies underlying the privilege and existing precedent on the subject, Justice Goldberg wrote:

> [W]e hold the constitutional rule to be that a state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its fruits cannot be used in any manner by federal officials in connection with a criminal prosecution against him. We conclude, moreover, that in order to implement this constitutional rule and accommodate the interests of the State and Federal Governments in investigating and prosecuting crime, the Federal Government

must be prohibited from making any such use of compelled testimony and its fruits.

*Id.* at 79, 84 S.Ct. 1594. He justified the holding as striking the following balance: "This exclusionary rule, while permitting the States to secure information necessary for effective law enforcement, leaves the witness and the Federal Government in substantially the same position as if the witness had claimed his privilege in the absence of a state grant of immunity." *Id.* He thus gave a reason for cutting back the required immunity from transactional to use plus derivative use, but did not independently justify the requirement of use plus derivative use immunity. For that, he simply accepted *Counselman* as correct.

In *Murphy's* aftermath, Congress revised the federal immunity statute from granting transactional immunity (which had been understood to be required since *Counselman*) to granting only use and derivative use immunity. Then, in *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), the Supreme Court considered the new statute. It was presented with a defendant who refused to testify after being granted use and derivative use immunity, claiming that only with transactional testimony could he be forced to testify. The Court revisited *Counselman* and clarified that only "use plus derivative use" immunity, rather than transactional immunity is required to overcome a privilege. 406 U.S. at 453, 92 S.Ct. 1653 ("We hold that such immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege"). Justice Powell explained:

> While a grant of immunity must afford protection commensurate with that afforded by the privilege, it need not be broader. Transactional immunity, which accords full immunity from prosecution for the offense to which the compelled testimony relates, affords the witness considerably broader protection than does the Fifth Amendment privilege. The privilege has never been construed to mean that one who invokes it cannot subsequently be prosecuted. Its sole concern is to afford protection against being forced to give testimony leading to the infliction of penalties affixed to ... criminal acts. Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, affords this protection. It prohibits the prosecutorial authorities from using the compelled testimony in *any* respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness.

*Kastigar,* 406 U.S. at 453, 92 S.Ct. 1653 (footnote and internal quotation marks omitted) (emphasis in original). This holding, still largely devoid of independent rationalization or reference to policy, thus reaffirmed the holding of *Counselman* that not merely compelled testimony, but also its fruits, are protected by the privilege against self-incrimination.

While the basic rule of use and derivative use immunity from *Kastigar* is now well-settled, there remains a serious question about how far that immunity should be extended. *See United States v. Helmsley,* 941 F.2d 71, 81 (2d Cir.1991) ("*Kastigar* considered only the facial validity of the federal use immunity statute and did not address the intricacies of what constitutes an impermissible use of immunized testimony."). Indeed, it is hardly clear that the broad language of *Kastigar* on which defendants rely—that the Self–Incrimination Clause "prohibits the prosecutorial authorities from using the compelled

testimony in *any* respect"—need be given its full effect. *Id.* In *United States v. Apfelbaum,* 445 U.S. 115, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980), eight years after *Kastigar,* Chief Justice Rehnquist wrote for the Court: "This Court has never held … that the Fifth Amendment *requires* immunity statutes to preclude *all* uses of immunized testimony." *Id.* at 125, 100 S.Ct. 948 (emphasis added). The immunity statutes are only intended to provide the protection to defendants that they would have received from invoking the Fifth Amendment, not necessarily to treat them as if they had remained silent. *Id.* at 127, 100 S.Ct. 948. The key, then, is what the Fifth Amendment requires.

### b. The policy considerations involved in applying a fruit of the poisonous tree doctrine to compelled testimony

It is always critical to understand the values on which any rule rests when deciding how far it should be extended. But this is particularly true here, as there are significant costs to the privilege against self-incrimination, and even more when it is extended to fruits. Judge Friendly described some of the costs of the privilege against self-incrimination in his incisive essay on the Fifth Amendment. *See* Henry J. Friendly, *The Fifth Amendment Tomorrow: The Case for Constitutional Change,* 37 U. Cin. L.Rev. 671 (1968).

Judge Friendly correctly observed that, "the fifth amendment privilege extends, by hypothesis, only to persons who have been breakers of the criminal law or believe they may be charged as such." *Id.* at 680. "While the other [testimonial] privileges [such as those accorded to husband and wife, attorney and client, doctor and patient, or priest and penitent] accord with notions of decent conduct generally accepted in life outside the courtroom, the privilege against self-incrimination defies them.

No parent would teach such a doctrine to his children … Those who are questioned consider themselves to be morally bound to respond, and the questioners believe it proper to take action if they do not." *Id.* Moreover, in the pre-trial stage, the privilege "seriously impedes the state in the most basic of all tasks, to provide for the security of the individual and his property, not only as against the individual asserting the privilege but as against others who it has reason to think were associated with him." *Id.* (footnote and quotation omitted). He continued:

> The privilege not only stands in the way of convictions but often prevents restitution to the victim—of goods, of money, even of a kidnapped child. In contrast to the rare case where it may protect an innocent person, it often may do the contrary. A man in suspicious circumstances but not in fact guilty is deprived of official interrogation of another whom he knows to be the true culprit; if the former is brought to trial, the best he can do is call the latter as a witness and hope the jury will draw the inference from the witness' assertion of the privilege which the jury cannot be told it may do with respect to his own.

*Id.*

Judge Friendly did not use these facts to argue for the abolition of the privilege, but for a reexamination of its precise scope. After all, his following observation remains his most correct:

> One would suppose that such a collection of detriments would have led the Supreme Court to expound the basis for the privilege thoughtfully and carefully before asking the country to accept extensions in no way called for by the fifth amendment's words or history. It thus is strange how rarely one encounters in the Court's opinions on the privilege the careful weighing of *pros* and *cons,* the

objective investigation of how rules of law actually work, and, above all, the consideration whether a less extreme position might not adequately meet the needs of the accused without jeopardizing other important interests, which ought to characterize constitutional adjudication before the Court goes beyond the ordinary meaning of the language. Instead, the privilege is treated with almost religious adulation.

*Id.* at 681 (footnote omitted).

Against this backdrop, I now turn to an examination of the values underlying the privilege against self-incrimination to determine whether they justify holding that statements, given under promises of use immunity, may never be used to lead investigators to evidence that could prove defendants' guilt in a future crime—a result that would be particularly anomalous here, where the Sassons sought use immunity only as an interim step without which they could never have safely engaged in proffer sessions where they hoped to secure transactional immunity for past crimes.

The values underlying the privilege against self-incrimination were comprehensively cataloged by the Supreme Court in *Murphy v. Waterfront Commission,* 378 U.S. 52, 55, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964):

> The privilege against self-incrimination "registers an important advance in the development of our liberty—'one of the great landmarks in man's struggle to make himself civilized.'" *Ullmann v. United States,* 350 U.S. 422, 426, 76 S.Ct. 497, 100 L.Ed. 511. It reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisito-

rial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates "a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load," 8 Wigmore, Evidence (McNaughton rev., 1961), 317; our respect for the inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private life," *United States v. Grunewald,* 233 F.2d 556, 581–82 (2d. Cir.) (Frank J., dissenting), rev'd 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes 'a shelter to the guilty,' is often 'a protection to the innocent.' *Quinn v. United States,* 349 U.S. 155, 162, 75 S.Ct. 668, 673, 99 L.Ed. 964.

*Id.* (footnote omitted). The values can be grouped into five categories. None of them requires that the privilege against self-incrimination include a universal "fruit of the poisonous tree" doctrine, let alone one that endures indefinitely.

### 1. The "cruel trilemma"

In the instant case, the Sassons never faced a "cruel trilemma of self-accusation, perjury or contempt" when they provided immunized statements to the United States Attorney in 1993 in hopes of receiving transactional immunity. Had the Sassons chosen to remain silent, there would have been no threat of contempt. The only threat was that they might have been prosecuted for the crimes the United States Attorney was investigating and for which they ultimately avoided prosecution. Had the Sassons made a false statement, meanwhile, there would have been no

threat of perjury because they were not compelled to speak under oath. There could have been a danger of prosecution under 18 U.S.C. § 1001 for making false statements to a federal officer, but that certainly does not implicate the privilege against self-incrimination. *See United States v. Apfelbaum*, 445 U.S. 115, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980) (holding that Fifth Amendment did not preclude use of defendant's immunized testimony in a prosecution for subsequently making false statements). Finally, there was no danger of self-accusation because the Sassons were given transactional immunity. Put simply, the Sassons made a strategic decision and are now seeking to reap as many benefits as they can. Certainly, the admission of fruits of their statements nine years later cannot turn what was a strategic decision into a "cruel trilemma." At most, the Sassons faced a "trilemma of truth, falsity, or silence." *Pennsylvania v. Muniz*, 496 U.S. 582, 597, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990). But it is not clear why that should be a concern of the privilege against self-incrimination.

It is also worth noting that there is a serious question about whether the suppression of fruits of compelled statements is ever necessary to prevent placing a defendant in the cruel trilemma in a *Counselman* case. Passing over whether such a trilemma is in fact "cruel," it is simply not relevant when discussing fruits. There is no legitimate fear of "self-accusation" when evidence found by the police is admitted against a defendant whose statements helped lead them to it. The self-accusation is the statement that led the police to the evidence. The evidence is simply evidence, and it bears a wholly different gloss before a jury than does a confession. As long as the evidence is admitted with independent foundation, there will be no self-accusation *in a criminal case.* Similarly, there will be no fear

of perjury from the admission of fruits because the prosecution will seek its own authentication and will not rely on the defendant's statement for its truth. *See* Friendly, 37 U. Cin. L.Rev. at 702. In short, it is difficult to see why this trilemma should bar the fruits of compelled testimony.

### 2. *Inhumane treatment*

This is a critical concern, but it is rarely implicated. In the run-of-the mill *Counselman* case where a witness is compelled to testify before a grand jury or where, as here, a witness agrees to cooperate in exchange for immunity, there is virtually no possibility of inhumane treatment going undetected. There is therefore no legitimate fear that would demand exclusion of fruits of such compelled or immunized testimony. Moreover, in those few circumstances of actual inhumane treatment, a comprehensive exclusionary rule reaching the fruits of such violations could be based on the Due Process Clause alone. There is no need for a separate expansion of the Self–Incrimination Clause's exclusionary rule on this ground.

### 3. *Privacy values*

"No Supreme Court decision has upheld a Fifth Amendment claim predicated solely, or even primarily, on the basis of an invasion of privacy." *In re Horowitz*, 482 F.2d 72, 85 (2d Cir.), *cert. denied*, 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973). Indeed, the entire notion that a witness can be compelled to testify without probable cause if given use immunity is inconsistent with the privacy value mentioned in *Murphy.* Privacy is not being protected by the Fifth Amendment—it is only the right to be free of testimonial self-incrimination. In any event, the question is, once we have the compelled testimony, does using it to generate leads and other evi-

dence violate "our sense of fair play which dictates a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him"? *Murphy,* 378 U.S. at 55, 84 S.Ct. 1594 (quoting 8 Wigmore, Evidence, 317 (McNaughton rev., 1961)). Alternatively, does such an intrusion unfairly infringe on a defendant's right "to a private enclave where he may lead a private life"? *Id.* (quoting *United States v. Grunewald,* 233 F.2d 556, 581 (Frank, J., dissenting), *rev'd* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931). Again, if our sense of privacy is untroubled by the compulsory production of non-testimonial evidence or by the compulsory production of testimonial statements that cannot be used against an individual, it is hard to understand why we would suddenly become troubled by the use of evidence simply because it is derived from testimonial evidence—without further involvement of the individual—particularly when that evidence relates to a future crime. It does not further infringe on a defendant's "private enclave" in any way.

### 4. Concern with unreliability of compelled statements

This, of course, is a serious concern in the coerced confession branch of Self–Incrimination Clause jurisprudence. But even there, we recognize that there is a difference between the fear of unreliability we feel regarding the statement of a defendant and regarding the evidence to which it leads. *See Patane,* —— U.S. ——, 124 S.Ct. 2620, 159 L.Ed.2d 667; *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974); *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). As Judge Friendly has observed:

> Although many citizens devoted to the Bill of Rights may not agree that a "fair state-individual balance" requires the government "to shoulder the entire load" in the investigation as it does in the prosecution of crime, few will deny that one innocent man sent to his death or to a long prison term because of a false confession is one too many. There is thus good reason to impose a higher standard on the police before allowing them to use a confession of murder than a weapon bearing the confessor's fingerprints to which his confession has led.

Friendly, Benchmarks, at 282. Here, where the compelled testimony typically is given in the context of significant safeguards, it is still harder to conceive of how any concern for unreliability would justify exclusion of fruits of testimony compelled under a grant of use immunity. The fruits would need independent authentication, and the fact that compelled testimony led to their discovery would have no bearing on their reliability.

### 5. The relative roles of the state and individual in the investigation and prosecution of crime

Of the values *Murphy* identified as underlying the privilege against self-incrimination this seems to be the one most directly implicated by the possibility of using fruits of compelled testimony or immunized statements against a defendant. Because we prefer that "the government in its contest with the individual shoulder the entire load," and because we "prefer[ ] an accusatorial rather than an inquisitorial system," the Supreme Court has long been troubled by using evidence derived from statements of a defendant against that defendant. But again, the Supreme Court has repeatedly held, quite to seemingly to the contrary, that a defendant can be forced to provide evidence against himself. *See, e.g., Schmerber,* 384 U.S. 757, 86 S.Ct. 1826 (allowing the government to compel a defendant to provide blood samples to be

used as evidence against him); *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) (allowing the government to compel a defendant to provide handwriting exemplars to be used as evidence against him); *United States v. Dioniosio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (allowing the government to compel a defendant to provide voice exemplars to be used as evidence against him). As Judge Friendly has written:

> What is so difficult to reconcile from the standpoint of an ordered society is the uncompromising rigidity concerning what can be taken from a man's mouth in the form of speech with this common-sensible view concerning what can be taken from it in the form of saliva.

Friendly, *Benchmarks*, at 277. Indeed, it seems that a desire to have the government "shoulder the entire load" could not possibly provide sufficient justification for the application of an indefinite fruit of the poisonous tree doctrine to violations of the privilege against self-incrimination.

#### c. *Applying Kastigar to the current case*

With this history and these values as a backdrop, I now turn to the Sassons' claim and consider how to apply *Kastigar's* language. In a concurring opinion for the Second Circuit, Judge Van Graafeiland reviewed a decision of Judge Weinstein that involved an extremely analogous set of facts. *See United States v. Gallo*, 859 F.2d 1078 (2d Cir.1988) (Van Graafeiland, J., concurring). While the other two members of the panel chose not to address the issue, Judge Van Graafeiland recognized that the case "squarely present[ed] the issue whether Justice Powell's broad language in *Kastigar v. United States* was intended to mean that a grant of immunity under section 6002 will provide derivative use immunity for crimes not yet committed or even contemplated when the grant was made." *Id.* at 1086–87. Indeed, Judge Weinstein had expressed its theme to be "Immunization does not provide a warrant to commit new crimes." *Id.* at 1087 (quoting *United States v. Gallo*, 671 F.Supp. 124, 124 (E.D.N.Y.1987)).

Judge Weinstein and Judge Van Graafeiland both concluded that the Fifth Amendment privilege does not protect a criminal defendant from incriminating himself against all future crimes. Judge Weinstein explained that the Supreme Court has "repeatedly emphasized the importance of chronology in construing an immunity grant." 671 F.Supp. at 133 (citing *United States v. Bryan*, 339 U.S. 323, 340, 70 S.Ct. 724, 94 L.Ed. 884 (stating that under pre–1970 immunity statute, immunity was intended to apply "only to *past* criminal acts concerning which the witness should be called to testify"); *Glickstein v. United States*, 222 U.S. 139, 142, 32 S.Ct. 71, 56 L.Ed. 128 (1911) (stating that the privilege "relates to the past, and does not endow the person who testifies with a license to commit perjury"); *United States v. Wong*, 431 U.S. 174, 97 S.Ct. 1823, 52 L.Ed.2d 231 (1977)). Judge Van Graafeiland, meanwhile, wrote: "Insofar as the Fifth Amendment is concerned, the consensus seems to be that, in the ordinary run of criminal cases, the only hazards of incrimination that are real and substantial are those which relate to past misdeeds or a continuing course of criminal activity." 859 F.2d at 1089 (citing *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973); *Marchetti v. United States*, 390 U.S. 39, 54, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); *United States v. Brimberry*, 779 F.2d 1339, 1346 (8th Cir. 1985); *United States v. Black*, 776 F.2d 1321, 1326–27 (6th Cir.1985); *United States v. Quatermain, Drax*, 613 F.2d 38, 42 (3d Cir.1980)). These conclusions were consistent with statements dating as far

back as *Counselman,* where the Court had written that the object of the Self–Incrimination Clause "was to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself *had* committed a crime." 142 U.S. at 562, 12 S.Ct. 195 (emphasis added).

As a matter of policy as well, both judges recognized that a contrary holding would pervert the purpose of the privilege and grants of immunity. Judge Van Graafeiland explained that, "if the Supreme Court's holding in *Kastigar v. United States* is as broad as Justice Powell's opinion would seem to indicate," even the most innocent of questions "would forever entitle the witness to Fifth Amendment immunity for his answer." 859 F.2d at 1088 (citation omitted). He continued:

> Indeed, no matter how innocuous a question may appear to be, if immunity is claimed, it would be the rare prosecutor, Attorney General, or judge who could guarantee that, twenty-five or thirty years later, the answer to the question would not be used derivately to connect the witness to some unlawful event. If the Constitution henceforth is to be construed in this manner, even a witness who has led an impeccable life would be well-advised not to testify before a grand jury without a grant of complete immunity. A prosecutor also would be foolish to secure a general grant of immunity for a prospective witness, as Congress specifically has authorized him to do. The prosecutor might find that he unwittingly has given the prospective witness an "immunity bath", *see* H.R.Rep. No. 1549, 91st Cong., 2d Sess. 42, reprinted in 1970 U.S.Code Cong. & Admin. News 4007, 4017, or "insulation for a career of crime about to be launched." *United States v. Freed,* [401 U.S. 601, 607, 91 S.Ct. 1112 (1971) ].

859 F.2d at 1088. Like Judge Van Graafeiland, I "do not believe that Congress intended that, in a case such as this, the grant should protect against the derivative use of the immunized testimony in connection with any crime, no matter how remote in time and place and unpredictable in nature it might be." *Id.* at 1089. The reason is simple: The proper question "is not what would have occurred had the witness remained silent pursuant to the privilege, but rather, what the witness may properly have withheld pursuant to the privilege in the first place." *Gallo,* 671 F.Supp. at 135. "To be coextensive with the privilege, the immunity need not 'treat the witness as if he had remained silent.' It is 'analytically incorrect to equate the benefits of remaining silent as a result of invocation of the Fifth Amendment privilege with the protections conferred by the privilege.'" *Id.* (quoting *Apfelbaum,* 445 U.S. at 127, 100 S.Ct. 948). Rather, "the immunity granted need only remove those sanctions which generate the fear justifying the invocation of the privilege." *Ullmann v. United States,* 350 U.S. 422, 431, 76 S.Ct. 497 (1956).

In the words of the Supreme Court, "[the Sassons'] argument assumes the existence of a periphery of the Self–Incrimination Clause which protects a person against incrimination not only against past or present transgressions but which supplies insulation for a career of crime about to be launched. We cannot give the Self–Incrimination Clause such an expansive interpretation." *United States v. Freed,* 401 U.S. 601, 606–07, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971). Thus, even if the immunized statements the Sassons provided in 1992 had been meaningfully used, *Kastigar* would not require me to give the Sassons an "immunity bath" today because the privilege against self-incrimination would not have prevented the Sassons from being

compelled to answer questions about criminal activity they could possibly engage in years later. A contrary holding would create perverse incentives for the testifying witness. More to the point, it would place a great burden on criminal investigation and prosecution without serving any of the values underlying the privilege against self-incrimination. This cannot be the intent of *Kastigar* or the Fifth Amendment.

One line of cases that Judge Weinstein and Judge Van Graafeiland rightly distinguished is worth mentioning here. In cases considering whether licensing requirements could violate the privilege against self-incrimination because they would require individuals to announce an intention to commit a crime, the Supreme Court abandoned a "rigid chronological distinction between past and prospective acts." *Marchetti v. United States,* 390 U.S. 39, 53, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968). The Court decided instead that the appropriate question was "whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination." *Id.* (citing *Rogers v. United States,* 340 U.S. 367, 374, 71 S.Ct. 438, 95 L.Ed. 344 (1951); *Brown v. Walker,* 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896)). In *Marchetti,* a professional gambler was forced to choose between "openly exposing himself as acting in violation of state and federal gambling laws and risking federal prosecution for tax avoidance." *United States v. Apfelbaum,* 445 U.S. at 129, 100 S.Ct. 948 (describing *Marchetti*). The Court acknowledged that "prospective acts will doubtless ordinarily involve only speculative and insubstantial risks of incrimination," but that was not the case in the circumstances of *Marchetti* where the "registration, and the acquisition of a wagering tax stamp, may serve as decisive evidence that [the registrants] have in fact subsequently violated state gambling prohibitions." 390 U.S. at 54, 88 S.Ct. 697.

The Sassons' case is significantly different from *Marchetti.* The core concern of the privilege against self-incrimination is that a defendant's compelled statements will be directly used against him in a prosecution related to those statements. *Marchetti* involved nothing short of a compelled admission of an intent to violate the law imminently, an admission that would be decisive evidence in a subsequent trial. But when the Sassons cooperated with the United States Attorney in Florida, there was no substantial and real concern that they would be incriminating themselves for an as-yet-uncontemplated crime that they would commit nine years later. The Sassons' situation is more comparable to that presented in *United States v. Apfelbaum,* 445 U.S. 115, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980), where the Supreme Court considered whether a truthful immunized statement could be used against a defendant in a perjury prosecution for subsequently-made false statements. Although clearly the immunized testimony was being "used" in a fashion arguably prohibited by a broad reading of *Kastigar,* the Court explicitly distinguished *Marchetti* and held that this use did not violate the Fifth Amendment or the immunity provisions of 18 U.S.C. § 6002. It reasoned:

> [W]e conclude that the Fifth Amendment does not prevent the use of respondent's immunized testimony at his trial for false swearing because, at the time he was granted immunity, the privilege would not have protected him against false testimony that he later might decide to give.... [A] future intention to commit perjury or to make false statements if granted immunity because of a claim of compulsory self-incrimination is not by itself sufficient to create a "substantial and real" hazard

that permits invocation of the Fifth Amendment.

445 U.S. at 130–31, 100 S.Ct. 948. The Sassons' "future intention to commit" money laundering with their current co-defendants, assuming they harbored such an intention, was no more "substantial and real" in 1993. It was not a subject regarding which the Sassons could have invoked the privilege in 1993, and thus it did not involve any fear for which they needed to receive immunity before agreeing to speak. Indeed, as previously noted, the immunity the Sassons sought was for the crimes they had already committed, and the use immunity was solely a vehicle to secure that result.

In somewhat more general terms, this problem was addressed three years after the decision in *United States v. Gallo* by another panel of the Second Circuit. *See United States v. Helmsley*, 941 F.2d 71 (2d Cir.1991). In June and November of 1985, Leona Helmsley was compelled to testify before New York State grand juries investigating alleged sales tax fraud by two New York jewelers. Mrs. Helmsley received a statutory grant of transactional immunity in addition to the constitutionally mandated use immunity. 941 F.2d at 79. After her testimony, a number of journalists were inspired to investigate the Helmsleys and write newspaper articles building on her grand jury testimony. These articles, in turn, led an Assistant United States Attorney, who had been investigating Mr. Helmsley on an unrelated tax matter, to widen his probe to include allegations made in the newspaper articles. When Mrs. Helmsley was ultimately brought to trial and convicted she claimed that her privilege against self-incrimination had been violated.

> Hypothesizing a direct "chain of taint" from her immunized testimony to the November 1986 newspaper stories to

Pierson's Post article to the federal investigation to her prosecution and convictions, she concludes that her prior immunized testimony was the "but for" cause of her instant convictions and hence that her right against self-incrimination has been violated.

941 F.2d at 80–81.

The Second Circuit rejected Mrs. Helmsley's claim of privilege. It wrote:

> Mrs. Helmsley argues that a cause-in-fact relationship between immunized testimony and a subsequent conviction, without more, triggers Fifth Amendment protection. That position, however, expands the right against self-incrimination far beyond any discernible policy served by the right. If a grand jury witness testifying under a grant of immunity were recognized by a grand juror as the perpetrator of a bank robbery committed the week before, an undeniable causal link between the immunized testimony and a conviction for bank robbery would exist, but a plausible Fifth Amendment argument could not be made. Similarly, if Pierson's interest as sparked by the grand jury story had caused him to scrutinize Mrs. Helmsley's future conduct and induced some of her employees to aid his ongoing investigation, she would certainly not be immune from prosecution for tax evasion occurring after the grand jury appearance although the causal connection to the immunized testimony would be as strong as in the instant matter.

*Id.* at 82. This sentiment was consistent with the Supreme Court's interpretation of the Fourth Amendment's exclusionary rule. *See Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) ("We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light *but for the illegal actions* of the

police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' "). It also led the Second Circuit to the following conclusion: "What is lacking in Mrs. Helmsley's argument is a link between the chain of causation in her case, largely fortuitous, and policies underlying the Fifth Amendment." *Id.*

In the end, a link between the chain of causation and the policies underlying the Fifth Amendment is lacking all too often in cases where defendants seek to challenge the admission of evidence as the fruit of compelled testimony. This is why *Kastigar's* expansive language has not been given its full effect. *See Gallo,* 671 F.Supp. at 136 (recognizing that in *United States v. Apfelbaum,* 445 U.S. 115, 120 n. 6, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980), "the Supreme Court acknowledged that this language was somewhat hyperbolic and inconsistent with the history and logic behind the privilege"). It is also why I have taken the time to write at such length. To be sure, "[t]his constitutional protection must not be interpreted in a hostile or niggardly spirit." *Ullmann v. United States,* 350 U.S. 422, 426, 76 S.Ct. 497, 100 L.Ed. 511 (1956). But nor should it be interpreted thoughtlessly.

\* \* \*

There is a fundamental tension in current Fifth Amendment jurisprudence. The Fifth Amendment Self–Incrimination Clause says simply that no person "shall be compelled in any criminal case to be a witness against himself." Nevertheless, a person may be compelled to testify. And a person may be compelled to provide evidence against himself. It is only when these two authorized compulsions are put together—when a person is compelled to provide evidence against himself through testimony and leads derived therefrom—that the Supreme Court has rigidly applied an exclusionary rule.

In one important branch of Fifth Amendment jurisprudence, the Supreme Court has largely accepted the view that fruits of coerced confessions should be admissible. Specifically, the Supreme Court recently reaffirmed the principle that the privilege against self-incrimination does not bar the admission of fruits of confessions obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See United States v. Patane,* —— U.S. ——, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004). Clarifying its prior holdings in *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), and *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the plurality opinion stated that, "[t]he admission of such fruit presents no risk that a defendant's coerced statements (*however defined*) will be used against him at a criminal trial." *Id.* at 2630 (emphasis added). The rule adopted with regard to fruits of *Miranda* violations may be rooted in part on the prophylactic nature of the *Miranda* rule itself. *See id.; see also New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (O'Connor, J., concurring). But because the Court has recently reaffirmed that *Miranda* is a constitutional rule derived from the Fifth Amendment, such reasoning would be subject to challenge. *See Dickerson v. United States,* 530 U.S. 428, 444, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) ("*Miranda* announced a constitutional rule that Congress may not supersede legislatively"). In any event, the Court's language is broader.

The plurality opinion's reasoning in *Patane* was largely based on the fact that *Miranda* is a trial right—the "police do

not violate the Constitution (or even the *Miranda* rule, for that matter), by mere failures to warn." *Patane*, 124 S.Ct. at 2626. It is only when improperly obtained confessions are admitted at a defendant's trial that his Fifth Amendment rights become violated. "And, at that point, '[t]he exclusion of unwarned statements ... is a complete and sufficient remedy' for any perceived *Miranda* violation." *Id.* at 2629 (quoting *Chavez v. Martinez*, 538 U.S. 760, 790, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003)). It continued: "There is simply no need to extend (and therefore no justification for extending) the prophylactic rule of *Miranda* to this context." *Id.* at 2630. That analysis, however, could apply equally to all alleged Self–Incrimination Clause violations, which never in fact occur until a defendant is compelled to be a witness against himself "in a criminal case." If the Court was willing to consider the policies behind extending an exclusionary rule to the fruit of the poisonous tree in the *Miranda* context, why should it be unwilling to reexamine them in the context of *Counselman* violations?

In the context of the Fourth Amendment, the Supreme Court has provided the following justification for extending the exclusionary rule to fruits of the poisonous tree:

> The core rationale consistently advanced by this Court for extending the exclusionary rule to evidence that is the fruit of unlawful police conduct has been that this admittedly drastic and socially costly course is needed to deter police from violations of constitutional and statutory protections. This Court has accepted the argument that the way to ensure such protections is to exclude evidence seized as a result of such violations notwithstanding the high social cost of letting persons obviously guilty go unpunished for their crimes. On this rationale, the prosecution is not to be put in a better position than it would have been in if no illegality had transpired. ··

*Nix v. Williams*, 467 U.S. 431, 442–43, 104 S.Ct. 2501 (1984). In the Fourth Amendment, however, the fruit of the illegality is the only evidence that can be suppressed and is the only deterrent available. Moreover, the secondary fruit of the illegality (or fruits derived from fruits) is not invariably treated in the same way as evidence that is the direct result of the illegality. *See Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407 (1963) (explaining that the taint of an illegality may dissipate, rendering exclusion unnecessary). In the Fifth Amendment, there is already a built-in exclusionary rule for the direct fruit— the testimony itself. *See Patane*, 124 S.Ct. at 2628 ("Unlike the Fourth Amendment's bar on unreasonable searches, the Self–Incrimination Clause is self-executing.... This explicit textual protection supports a strong presumption against expanding the *Miranda* rule any further.")

Finally, it is important to remember that extending the non-exclusion of fruits rule from *Miranda* violations to other Fifth Amendment violations would not be a novel proposition. In England, for example, there was a well-established prohibition against compelled testimony and coerced confessions. Nevertheless, it has long been presumed that, even where a confession is inadmissible, "anything that confession led to may be given in evidence." *The Queen v. Leatham*, 8 Cox Crim. Cas. 498, 503 (Q.B.) (1861) (Crompton, J.). Indeed, this was the standard at Common Law at the time of the Constitution. *See The King v. Warickshall*, 1 Leach 263, 168 Eng. Rep. 234 (1783); *The King v. Lockhart*, 1 Leach 386, 168 Eng. Rep. 295 (1785). In *Warickshall*, a defendant had made an inadmissible statement leading investigators to where she had hidden cer-

tain stolen property. The court held that even though the confession could not be used against the defendant, the property and any independent link to the defendant could be. In *Lockhart,* a defendant was interrogated until he admitted that he had stolen property and given it to another individual named Grant. When investigators met with Grant and later sought to have him testify, the defendant objected, as the evidence was found through an improperly obtained confession. The court wrote: "[A]lthough a confession improperly obtained cannot be given in evidence, yet it can never go to the rejection of the evidence of other witnesses, which are got at in consequence of such a confession. 1 Leach at 387. In the centuries since these English decisions, while American courts have ever-expanded their interpretation of the privilege against self-incrimination, English Courts have maintained that regardless of the admissibility of compelled statements, evidence found as a result of that compulsion should be admissible". *See Commissioners of Customs and Excise v. Harz,* 1 All Eng. Rep. 177 (1967); Gotleib, *Confirmation by Subsequent Facts,* 72 L.Q. Rev. 209, 223–224 (1956); *see also* Stephen C. Thaman, *Miranda in Comparative Law,* 45 St. Louis U.L.J. 581(2001).

England is not the only jurisdiction whose approach to compulsory self-incrimination warrants mention. In 1937, speaking for eight Justices of the Supreme Court (including Chief Justice Hughes and Justices Brandeis, Stone and Black), Justice Cardozo remarked that immunity from compulsory self-incrimination "might be lost, and justice still be done" and that as long as protection against torture remained, "justice would not perish if the accused were subject to a duty to respond to orderly inquiry." *Palko v. Connecticut,* 302 U.S. 319, 325–26, 58 S.Ct. 149, 82 L.Ed. 288 (1937). As evidence, he observed that, "[c]ompulsory self-incrimination is part of the established procedure in the law of Continental Europe." *Id.* at 326 n. 3, 58 S.Ct. 149.

"While most, if not all, democratic countries [now] have an equivalent of our Fifth Amendment privilege against self-incrimination, none of them—including Great Britain, the country from whom we derive the privilege—has interpreted it in as broad a manner as we have." *United States v. Rodrigues,* 68 F.Supp.2d 178, 187 (E.D.N.Y.1999). Indeed, although most jurisdictions prohibit the admission of blatantly coerced confessions, it is quite common to have plainly accusatorial systems where defendants are routinely interrogated, where their silence can be treated as relevant, where evidence resulting from compelled testimony is admissible, and where justice has not perished. *See* Jeffrey K. Walker, *A Comparative Discussion of the Privilege Against Self–Incrimination,* 14 N.Y.L. Sch. J. Int'l & Comp. L. 1 (1993); *see also Rodrigues,* 68 F.Supp.2d at 187–88 (chronicling certain recent developments in other countries' approaches to compulsory self-incrimination). I refer to this fact because several Justices of the Supreme Court have increasingly thought it appropriate to look to international norms of criminal procedure for guidance. *See, e.g., Atkins v. Virginia* 536 U.S. 304, 316 n. 21, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (referencing the growing consensus in the "world community" regarding the imposition of the death penalty on mentally retarded individuals); *Knight v. Florida,* 528 U.S. 990, 120 S.Ct. 459, 145 L.Ed.2d 370 (1999) (mem.) (Breyer, J., dissenting) (arguing that the Court should consider whether delay in administering capital punishment can be a constitutional violation because "[a] growing number of courts outside the United States [such as the Privy Council for Jamaica, the Supreme Court of India, the Supreme Court

of Zimbabwe and the European Court of Human Rights]—*courts that accept or assume the lawfulness of the death penalty*—have held that lengthy delay in administering a lawful death penalty renders ultimate execution inhuman, degrading, or unusually cruel"); *Stanford v. Kentucky*, 492 U.S. 361, 389, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989) (Brennan, J., dissenting) (arguing that the Court should take note of the fact that the world community "overwhelmingly disapproved" of the execution of juveniles). These Justices would presumably agree that, just as Justice Cardozo looked to the legal community outside the United States in determining whether the privilege against self-incrimination was essential to a scheme of ordered liberty and thus binding on the states through the Due Process Clause, it would be equally useful to look to that community here to determine how far to construe the Fifth Amendment beyond its language.

Regardless of how far abroad we look, however, it is clear that there is a significant difference between entering a defendant's compelled statements at his trial and entering the evidence to which those statements lead. If we give an expansive interpretation to the words "use" and "in *any* respect," the Supreme Court's language of *Kastigar* could be read to eradicate that difference in all cases. But such a reading is not mandated and has been cautioned against by the Supreme Court in *United States v. Apfelbaum.* These words were built upon a tenuous foundation in *Counselman v. Hitchcock,* and no genuine analysis was ever given to justify the appropriate standard. More importantly, accepting all of the policies behind the privilege against self incrimination set forth in *Murphy v. Waterfront Commission* as worth protecting, a broad reading of *Kastigar's* language is not required for such a goal. Indeed, the broad reading that de-

fendants suggest would not legitimately serve *any* policy underlying the privilege against self-incrimination but would burden other legitimate policies underlying the rule of law. The Sassons engaged in proffer sessions in 1992 in exchange for more immunity than they would have been entitled to under the Fifth Amendment. They were promised that they would not be prosecuted for the underlying crime about which they gave information and they were promised that their statements would not be used against them. Adding to that a prohibition on the use of the "fruit of the poisonous tree" that extends indefinitely to prosecutions for crimes committed nearly a decade after the proffer sessions would be nothing more than a windfall.

### *Conclusion*

I denied the Sassons' motion to suppress conversations recorded through the wiretap on their co-defendant's phone because the immunized statements that were included in the wiretap application were not material to the issuance of the warrant or the ultimate recording of the conversations. But even if the immunized statements had been material, that would not have provided a basis for suppression because the statements were made in an effort to receive transactional immunity for a crime that took place nearly a decade before the distinct crime for which the Sassons are now charged.